EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
DAMARIS M. DIAZ (Cal. Bar No. 277524)
WILLIAM M. ROLLINS (Cal. Bar No. 287007)
Assistant United States Attorneys
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-0302/7407
     Facsimile:  (213) 894-0141
     E-mail:     damaris.diaz@usdoj.gov
                 william.rollins@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 16-320-RGK |
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION AND RESPONSE TO DEFENDANT WASHINGTON BRYAN II'S OBJECTIONS TO PSR; EXHIBITS |
| v. | |
| WASHINGTON BRYAN II | |
| Defendant. | Sent. Date:  February 21, 2017 Time:       10:00 a.m. Place:      Courtroom of the Hon. R. Gary Klausner |

Plaintiff United States of America, by and through its attorneys of record, Assistant United States Attorneys Damaris M. Diaz and William M. Rollins, hereby submits its position in aid of sentencing defendant Washington Bryan II.  The government recommends that defendant be sentenced to a 37-month term of incarceration, followed by a three-year period of supervised release, and ordered to pay a fine of $1,356,788 and a $2,900 special assessment. Furthermore, the government concurs in the factual findings (unless

1

discussed otherwise, below) and advisory Guidelines calculations in the Presentence Report ("PSR") disclosed on January 17, 2017 (Dkt. 96).  The government's position is based on the files and records of this case, the attached memorandum of points and authorities and exhibits, and such further evidence and argument as may be presented at the sentencing hearing.


Dated: February 14, 2017          Respectfully submitted,

                                  EILEEN DECKER
                                  United States Attorney

                                  LAWRENCE S. MIDDLETON
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                  __/s/_____
                                  DAMARIS M. DIAZ
                                  WILLIAM M. ROLLINS
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES..............................................iii

I.    INTRODUCTION................................................ 1

II.   BACKGROUND.................................................. 2

    A.   The Crime of Structuring................................ 2

    B.   Defendant's Structuring Conduct......................... 2

    C.   Medical Board Disciplinary Action Against Defendant...... 4

    D.   Prescription Data and Expert Testimony................... 5

    E.   Testimony from Defendant's Former Employee.............. 7

    F.   The Jury Rejected Defendant's Story and Found Him Guilty. 9

    G.   Postal Money Order Transactions After Trial. . . . . . .9

III.  GOVERNMENT'S ANALYSIS OF THE STATUTORY PROVISIONS AND
    SENTENCING GUIDELINES....................................... 11

    A.   Statutory Provisions................................... 11

    B.   Sentencing Guidelines.................................. 11

IV.   SENTENCING RECOMMENDATION................................... 14

    A.   The Nature and Circumstances of the Offense............ 14

        1.   Structuring is a Serious Offense................... 14

        2.   Defendant's Structuring Allowed Him to Conceal a
        Lucrative and Dangerous "Pill Mill"................ 16

    B.   The History and Characteristics of Defendant........... 17

    C.   The Need to Reflect the Seriousness of the Offense, Promote
    Respect for the Law, Provide Just Punishment, Afford
    Adequate Deterrence and Protect the Public from Further
    Criminal Conduct...................................... 19

    D.   The Court Should Impose a Fine of $1,356,788........... 22

    E.   The Court Should Order Defendant to Surrender his DEA
    License as a Condition of Supervised Release........... 24

V.    CONCLUSION................................................. 26

1

## TABLE OF AUTHORITIES

2

CASES.................................................................... PAGE(S)

3

California Bankers Ass'n v. Shultz,
4
416 U.S. 21 (1974)..........................................................14

5
Gonzales v. Oregon,
546 U.S. 243 (2006).........................................................24

6
United States v. Armstead,
7
552 F.3d 769 (9th Cir. 2008)................................................12

8
United States v. Clark,
195 F.3d 446 (9th Cir. 1999)................................................25

9
United States v. Deskins,
10
2014 WL 670910 (W.D. Va. Feb. 20, 2014)................................14, 19

11
United States v. Eureka Labs., Inc.,
103 F.3d 908 (9th Cir. 1996)................................................23

12
United States v. Fine,
13
975 F.2d 596 (9th Cir. 1992)................................................12

14
United States v. One Hundred Thirty Three (133) U.S. Postal Service
Money Orders,
780 F. Supp. 2d 1084 (D. Hawaii 2011).......................................20

15
United States v. Orlando,
16
553 F.3d 1235 (9th Cir. 2009)...........................................22, 24

17
United States v. Rivera-Gomez,
634 F.3d 507 (9th Cir.2010).................................................21

18
United States v. Strelski,
19
523 F. App'x 704 (11th Cir. 2013)...........................................14

20
United States v. Tanke,
743 F.3d 1296 (9th Cir. 2014)...............................................21

21
United States v. Wang,
22
418 F. App'x. 19 (2d Cir. 2011).............................................14

23
STATUTES

24
18 U.S.C. § 3353(a).........................................................13

25
18 U.S.C. § 3553(a)(A)-(D)..................................................18

26
18 U.S.C. § 3571...........................................................22

27
18 U.S.C. § 3572(a)........................................................22

28

## TABLE OF AUTHORITIES (CONT'D)

21 U.S.C. § 822(a)(2)...........................................24

21 U.S.C. §§ 801-971...........................................25

31 U.S.C. § 5324(a)(3)......................................1, 10

31 U.S.C. § 5325...........................................9, 20

31 U.S.C. § 5324(d)(2).........................................14

31 U.S.C. §§ 5313(a)...........................................2

RULES

U.S.S.G § 2S1.3(a)(2)..........................................11

U.S.S.G. 2B1.1(b)(1)(H).......................................12

U.S.S.G. § 1B1.3........................................12, 13, 21

U.S.S.G. § 5F1.5...............................................24

U.S.S.G. § 5F1.5(a)-(b)........................................24

U.S.S.G. § 5F1.5(b)............................................25

U.S.S.G. § 2S1.3...............................................11

REGULATIONS

31 C.F.R. 1010.410.............................................2

31 C.F.R. § 103.29(b).......................................9, 20

Other Authorities

Instructions 2.96 (2011).......................................2

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

On November 17, 2016, defendant Washington Bryan II ("defendant") was convicted by a federal jury of 29 counts of structuring, in violation of 31 U.S.C. § 5324(a)(3).  Defendant's structuring conduct was prolific: over a 15-month period, he engaged in (or aided and abetted) at least 200 transactions designed to avoid federal reporting requirements, frequently traveling to two or three different banks in a single day, sometimes just minutes apart. Overall, between October 2011 and January 2013, defendant structured $1,217,213 in cash deposits at various banks near his medical practice in Los Angeles.

Defendant intentionally structured these deposits to conceal the massive amounts of cash he received in exchange for prescribing powerful narcotics such as Oxycodone and Oxymorphone.  In particular, after being placed on probation by the California State Medical Board in 2011 for allegedly overprescribing narcotic medications, defendant:

- Charged patients $500 or $600 cash in exchange for narcotic prescriptions;

- Refilled extremely high dosages of narcotic prescriptions in exchange for cash, without ever seeing patients;

- Prescribed the exact same drug combinations to a majority of patients;

- Allowed "caretakers" to bring tens of thousands of dollars in cash to his office in exchange for pre-written prescriptions for "Oxy";

1

- Engaged in prescribing practices that fit the pattern of a "pill mill," according to an expert witness.

For these reasons, and as set forth more fully below, the government respectfully requests that the Court sentence defendant to serve a 37-month period of incarceration, at the mid-range of the Presentence Report's ("PSR") advisory Guideline range, followed by a three-year term of supervised release; to pay a $1,356,788 fine; and to pay a $2,900 special assessment.  As a condition of supervised release, the government also respectfully requests that the Court order defendant to surrender his DEA registration, the federal licensure that doctors must have to handle controlled substances.

## II.   BACKGROUND

### A.   The Crime of Structuring

Every financial institution that engages in a cash transaction totaling more than $10,000 must prepare a report regarding the transaction.  That report must include, among other things, the identity and address of the person engaging in the transaction.  A person "structures" a transaction if that person, acting alone or with others, conducts currency transactions for the purpose of evading the reporting requirements.  See 31 U.S.C. §§ 5313(a), 5324(a)(3); 31 C.F.R. 1010.410; Tenth Circuit Model Criminal Jury Instructions 2.96 (2011).  To violate § 5313(a), a defendant must (1) knowingly structure or assist in structuring a currency transaction; (2) know of the financial institution's legal obligation to report currency transactions of more than $10,000; and (3) the purpose of

1  the structured transaction must have been to evade the reporting

2  obligation.  Id.

3       **B.   Defendant's Structuring Conduct**

4       Between October 17, 2011 and January 16, 2013, defendant, a

5  medical doctor, illegally deposited $1,217,213 in cash into four

6  separate bank accounts that he controlled (the "Structuring Period")

7  to avoid triggering the banks' obligations to report the deposits to

8  federal regulators.[1]  See PSR ¶¶ 11-13; Exhibit A (Summary of All

9  Cash Deposits); Exhibit B (Summary of Structured Currency

10 Transactions).  For example, on at least three days during the

11 Structuring Period, defendant was caught on bank surveillance footage

12 depositing $5,100 in cash at one bank (while, at another bank on the

13 same day, he deposited $7,400 in cash); $9,000 in cash (while, at two

14 other banks on the same day, he deposited $9,000 in cash); and $9,000

15 in cash (while, at one other bank on the same day, he deposited

16 $7,000 in cash and, at yet another bank on the same day, he deposited

17 $9,000 in cash).  Exhibit A at 1; Exhibit C at 2-4 (Surveillance

18 Photos).  Defendant also made below-reporting-threshold cash deposits

19 at two separate banks within an hour of each other, and sometimes

20 within minutes of each other.  Exhibit A at 1-3.

21

22

23      [1] The indictment charged $478,160 in specific deposits on 29
24 dates during the Structuring Period, but defendant's wife admitted at
   trial that she or defendant made all of the deposits below $10,000 at
25 defendant's banks during the Structuring Period.  Exhibit D, Day 2,
   Vol. II, at 87-92, 110.  A total of $1,271,213 in cash was deposited
26 (in increments below $10,000) between October 17, 2011 and January
   16, 2013.  Exhibit A.

27

28                                    3

When he was interviewed by agents after his arrest, defendant said that he was aware of the cash transaction reporting requirement, but claimed that he usually did not handle large quantities of cash. Exhibit D (Trial Transcripts) at Day 2, Vol. I at 118, 121; Trial Exhibits 21, 25.  Defendant also denied having cash patients.  Id.

## C. Medical Board Disciplinary Action Against Defendant

On February 4, 2011, before the Structuring Period, defendant settled a disciplinary action filed against him by the Medical Board of California ("MBC").  The MBC charged defendant with "excessively prescrib[ing] narcotic medications," and it cited instances in which defendant "failed to perform and/or document an initial history and physical examination," and "failed to establish a legitimate medical indication for the prescription of drugs to the patient, including OxyContin, Dilaudid, and promethazine with codeine cough syrup." Exhibit E (MBC Accusation and Settlement Order) at 29-31; 33-34.  The MBC also alleged that defendant "failed to perform and/or document periodic patient evaluations," id. at 29; "failed to refer the patient for consultations with psychiatrists, psychologists, and/or addictionologists," id.; and "failed to maintain adequate and accurate records of the medical services," id. at 30-31.  The MBC identified patient visits for which defendant maintained no medical records at all.  See, e.g., id. at 26.

Defendant conceded in writing that the MBC could establish a prima facie case against him for excess prescriptions of narcotic controlled drugs, gross negligence in prescribing such drugs, and

4

failure to maintain adequate or accurate medical files.[2]   Id. at 4, ¶¶ 8-11 (incorporating by reference allegations in Second Amended Allegation).   Defendant accepted a three-year period of probation. Id. at 5.

### D.   **Prescription Data and Expert Testimony**

After defendant's probationary period began – and at the same time that he was making hundreds of thousands of dollars in structured cash deposits at banks in Los Angeles – defendant continued to prescribe excessive amounts of narcotics to his patients.   Indeed, the evidence at trial established that defendant's cash deposits were directly linked to his lucrative routine of prescribing powerful narcotics to Medicare beneficiaries in exchange for $500 cash per patient "visit."

During the Structuring Period, defendant issued approximately 6,559 prescriptions for opioid narcotics to 328 Medicare beneficiaries.   Exhibit F (Expert Report) at 3.   Opioid analgesics made up about 93% of all controlled substance prescriptions written by defendant during this time.   Id. at 2.   Even though pain management specialists are expected to use the lowest effective dose of opioids to control for risk of serious harm to patients (such as drug overdoses), defendant regularly prescribed "the highest available strength" of opioid analgesics to his patients.   Id. at 4.

---

[2] The PSR states that defendant "made no admissions" in the probationary proceeding.   PSR ¶ 50.   More accurately, as is clear from the MBC records themselves, defendant "[d]id not contest that . . . [the MBC] could establish a prima facie case" with respect to the charges "and that [defendant] has thereby subjected his license to disciplinary action."   Exhibit E at 4, ¶ 9.

For instance, Dr. Michelle Thatcher, a pharmacist and expert witness for the government, testified at trial that almost 72 percent of defendant's patients were on the "exact same regimen" of opioid analgesics.  Exhibit D, Day 1, Vol. I at 45-46.  That regimen included immediate release, 30 milligram tablets of Oxycodone, dispensed in 240-unit doses for a 30-day supply, *combined* with 40 milligrams of Oxymorphone extended release tablets, dispensed in 120-unit doses for a 30-day supply.  Id. at 46.

In other words, 72 percent of defendant's patients received the exact same prescriptions for the exact same doses of two extremely powerful opioid drugs.  These drugs combined to provide an astonishingly high "morphine-equivalent dose" (or "MED") of 840 milligrams per day.  Id.[3]  Even more troubling, these powerful narcotics were being refilled "month after month" for the same patients, all of whom were submitting claims to have Medicare cover the cost of their prescriptions.  Id.

In fact, during the Structuring Period, Medicare Part D paid a total of $2,924,846.09 for all controlled substance prescriptions written by defendant.  Exhibit F at 2.  Medicare Part B (provider) claims data show, however, that defendant never made any claims for Medicare reimbursement for providing patient services for these individuals.  Id. at 72.  Instead, defendant's patients were literally handing him cash for the prescriptions, often without ever seeing

---

[3] An MED of 120 milligrams per day is considered a sign of over-utilization of morphine or narcotics, and an MED of 200 milligrams is associated with a *300 percent increase* in opioid-related mortality. 50.  Exhibit D, Day 1, Vol. 1 at 45, 50.

defendant at all after a preliminary visit.  Id. at 57 (Dr. Thatcher describing cash-pay model); see also id. at 93-97 (Vanessa Mayorga testifying that each "visit" was generally $500 cash, regardless of whether defendant was present).

Given the high volume and combination of defendant's opioid prescriptions – as well as the fact that defendant did not bill Medicare for any Part B services whatsoever – Dr. Thatcher opined that defendant's prescriptions habits were consistent with a "cash-pay" model and potential "pill mill" activity, i.e. a fraudulent scheme "in which a provider prescribes or dispenses a narcotic analgesic for a non-medical purpose."  Exhibit D, Day 1, Vol. I at 53, 56-57.

**E.   Testimony from Defendant's Former Employee**

Vanessa Mayorga, defendant's niece and former employee who worked as a nurse at his medical practice, offered additional testimony indicating that defendant's structuring was intended to conceal the cash income he generated from writing narcotics prescriptions.

At trial, Ms. Mayorga explained that "each appointment" to visit defendant for a prescription generally cost $500 in cash, regardless of whether defendant was even present to see each patient.  Exhibit D, Day 1, Vol. I at 90-93.  Based on her personal observations at defendant's clinic during the Structuring Period, Ms. Mayorga said she believed that "every patient" got "at least one" prescription for "Oxy."  Id. at 99.  She also made clear that defendant's medical business routinely consisted of accepting cash payments for pre-written prescriptions for drugs, not patient visits or diagnoses:

1  Q. So some patients would come in when Dr. Bryan was on

2  vacation?

3  A. Yes.

4  Q. And what would happen with those patients?

5  A. They would still get their prescriptions.

6  So they would come in, say they needed to see

7  Dr. Bryan. So they'd pay for their appointment, and then we'd

8  give them their prescription, they would head out.

9  Q. But Dr. Bryan wasn't in the office?

10  A. Right.

11  Q. So who wrote the prescription?

12  A. Dr. Bryan would. Either days before -- a day before he

13  left for his trip or he'd come in early before office hours and

14  write them all up and then leave them for us to distribute on

15  their scheduled days.

16  Q. And they were paying for what exactly?

17  A. To see Dr. Bryan.

18  Q. Even though Dr. Bryan wasn't present?

19  A. Right.

20  Id. at 91-92.

21  In addition, according to Ms. Mayorga, "caregivers" regularly

22  came to defendant's clinic on behalf of groups of up to 25 patients

23  and paid $500 in cash per patient, even though "not all of [the

24  patients] would show up."  Id. at 92-93.  Ms. Mayorga kept the

25  prescriptions clipped together by dates, and when individuals came to

26  the office they would "pay for their appointment" at which point she

27

28                                        8

would "just hand them their prescriptions, and then from there we wouldn't hear from them until the following month." <u>Id.</u>, Day 2, Vol. I, at 23.  "All the cash that was collected at the end of the day" would be counted by defendant, at which point defendant would "put [it] in his pockets and then go to the bank." <u>Id.</u> at 20.

**F.   <u>The Jury Rejected Defendant's Story and Found Him Guilty</u>**

The jury convicted defendant on all 29 counts charged in the Indictment, plainly rejecting the defense's theory that he deposited less than $10,000 in cash each day only because of purported cash insurance limits that applied to various clinics within his medical practice.  <u>Compare</u>, <u>e.g.</u>, Exhibit D, Day 2 Vol. II, at 82-99 (defendant's wife testifying on direct examination about purported policy limits and bank deposits for each clinic); <u>with</u> <u>id.</u> at 103-107 (defendant's wife testifying on cross examination that she did not have multiple accounts at one bank "[b]ecause I don't want to be confused with putting the money from pain [account] in acupuncture account," despite her training as an accountant).  In rejecting the theory fabricated by defendant (and in disbelieving his witnesses), the jury necessarily credited the government's theory that defendant's motive and intent to structure stemmed from his concealment of the cash income he received from his excessive narcotics prescriptions.

**G.   <u>Postal Money Order Transactions During and After Defendant's Trial</u>**

Beginning the same week that defendant was on trial in this case – and *even after he was convicted* – about $28,000 in postal money orders were used to pay off American Express credit cards held in

defendant's name during November and December of 2016.  Exhibit J
(Statement of IRS Agent Bryan Glover) ¶ 3; Exhibit K (Analysis of
Post-Conviction Money Order Transactions); Exhibit L (Images of
Postal Money Orders).  Similar to the offenses of conviction, each of
these transactions fell below reporting requirements (which, in the
case of postal money orders, is $3,000).  See 31 U.S.C. § 5325; 31
C.F.R. § 103.29(b).

For example, on November 14, 2016 – the day before defendant's
trial began - $4,000 in postal money orders were purchased at two
different post offices (located less than two miles apart) and then
used to pay off defendant's credit card.  Exhibits K-L.  Similarly,
on November 22, 2016 – the week after defendant was convicted of 29
counts of structuring – another $4,000 in postal money orders were
purchased at two different post offices, later used to send payments
defendant's American Express accounts.  Id.  Once again, these two
post offices were less than two miles apart.  Id.  The following day,
November 23, 2016, through six different transactions at three
different post offices in Los Angeles, another $6,000 in postal money
orders were obtained and later used to make additional payments to
defendant's American Express accounts.  Id.  Two of these post
offices were less than a mile apart (one on Motor Avenue in Los
Angeles and another on Culver Boulevard in Culver City), and another
was less than two miles away from those locations.  Id.

Had these transactions all occurred at a single post office,
they would have triggered reporting requirements under federal law.
Instead, because no more than $3,000 was purchased at multiple post

offices, no currency transaction reports were required, and the post offices were not required to record the purchaser's identity.

## III. GOVERNMENT'S ANALYSIS OF THE STATUTORY PROVISIONS AND SENTENCING GUIDELINES

### A. Statutory Provisions

Because the jury found defendant guilty on all 29 counts of structuring currency transactions in violation of 31 U.S.C. § 5324(a)(3), defendant's statutory maximum penalties are as follows:

| DESCRIPTION | MAXIMUM | PSR ¶ |
|---|---|---|
| Incarceration | 145 years | ¶ 61 |
| Supervised Release | 3 years | ¶ 64 |
| Fine | $7,250,000 | ¶ 68 |
| Special Assessment | $2900 | ¶ 69 |

### B. Sentencing Guidelines

The Probation Office prepared a PSR in this case, which was disclosed on January 17, 2017, calculating the total offense level as follows:

| DESCRIPTION | POINTS | USSG § | PSR ¶ |
|---|---|---|---|
| Base Offense Level | 6 | § 2S1.3(a)(2) | ¶ 19 |
| Value of Funds> $550k | 14 | § 2S1.3(a)(2); § 2B1.1(b)(1)(H) | ¶ 19 |
| Total Offense Level | 20 | § 2S1.3; § 2B1.1 | ¶¶ 19-21 |

Defendant has no criminal history. (PSR ¶¶ 30-37.) Based on a total offense level of 20 and a Criminal History Category of I, under the PSR's calculation defendant's guidelines range is 33-41 months'

11

incarceration, and 1 year to 3 years of supervised release. (PSR ¶¶ 62, 64-65.)   The fine range is $7,500 to $75,000.   (PSR ¶ 70.)

The government concurs with the PSR's overall calculation of the sentencing guidelines.   U.S.S.G § 2S1.3(a)(2) sets the base offense level for structuring at 6 and directs the Court to increase the Guidelines range by the "number of offense levels from the table in § 2B1.1 corresponding to the value of the funds."   The Commentary to USSG § 2S1.3 defines "value of the funds" as: "the amount of funds involved in the structuring or reporting conduct."   See also id. § 3D1.2 (multiple counts grouped together where offense level is determined largely on the basis of total loss and is continuous in nature).   Thus, the PSR has correctly added 14 points to defendant's base offense level pursuant to U.S.S.G. 2B1.1(b)(1)(H) as a result of a $1.2 million "loss" amount, i.e. the value of the structured funds.

In calculating this amount for sentencing purposes, the district court may take into account all acts and omissions, including uncharged crimes, if they are "'sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.'"   United States v. Armstead, 552 F.3d 769, 779 (9th Cir. 2008) (quoting U.S.S.G. § 1B1.3, cmt. n. 9(B)).   "Acts are part of the common scheme or plan if they are 'substantially connected to [the offense] by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi.'"   Id. (quoting U.S.S.G. § 1B1.3, cmt. n. 9(a).   See also United States v. Fine, 975 F.2d 596, 600 (9th Cir. 1992) (stating that the "relevant conduct provisions

... taken together with the fraud and grouping provisions, mean that conduct which was part of the scheme is counted [when calculating a defendant's sentence], even though the defendant was not convicted of crimes based upon the related conduct").

Here, while the indictment only charged defendant with 29 counts of structuring for a total amount of $478,160, the government introduced evidence regarding all of the cash deposits made below $10,000 into defendant's bank accounts during the Structuring Period. See Exhibit A.  Those deposits were all part of the same, common scheme to structure defendant's cash income by depositing less than the $10,000 amount that would have triggered currency transaction reports.  In fact, over the course of 15 months' worth of $1.2 million in cash deposits, *not a single deposit into any of defendants' accounts* exceeded $10,000.  Id.

Contrary to defendant's assertion that there "is no legal basis to add cash deposits," beyond those specifically charged in the Indictment (Def. Obj. at 2), defendant's wife testified at trial that both she and her husband made deposits at multiple banks in an amount of less than $10,000 throughout the Structuring Period.  Exhibit D, Day 2, Vol. II, at 87-92; see also id. at 110 (defendant's wife acknowledging on cross examination that $600,000 was deposited into a single Bank of America account between April 16, 2012 and January 7, 2013); id. at 122 (defendant's wife responding "yes," when asked whether she and defendant were both involved in making bank deposits).  That testimony – combined with the overwhelming evidence of structuring between October 2011 and January 2013 – is more than

13

sufficient to conclude that all of defendant's deposits below $10,000 during the Structuring Period were relevant conduct and part of an "ongoing series of offenses" under the Guidelines.  Armstead, 552 F.3d at 779.  See also Exhibit

Accounting for all of those additional, uncharged deposits below $10,000, which are clearly relevant conduct for the Court to consider, the total amount of structured funds is $1,217,213, and defendant's offense level should be increased by 14 points, as correctly set forth in the PSR.  See U.S.S.G. §§ 1B1.3, 2S1.3(a)(2), 2B1.1(b)(1)(H).

## IV.  SENTENCING RECOMMENDATION

The factors enumerated in 18 U.S.C. § 3353(a) warrant sentencing defendant to 37 months' incarceration, a fine of $1,356,788, three years' supervised release, and a $2,900 special assessment.

### A.  **The Nature and Circumstances of the Offense**

#### 1.  Structuring is a Serious Offense

Congress enacted the currency transaction reporting requirement because it recognized "the importance of reports of large and unusual currency transactions in ferreting out criminal activity." California Bankers Ass'n v. Shultz, 416 U.S. 21, 38 (1974); United States v. Wang, 418 F. App'x. 19, 22 (2d Cir. 2011) (noting structuring is very serious offense); see also United States v. Strelski, 523 F. App'x 704, 708 (11th Cir. 2013) cert. denied 134 S. Ct. 901, 187 L. Ed. 2d 788 (2014)("The punishments selected by the legislature show that it considers structuring to be a serious offense that warrants a serious punishment, and we cannot second

14

guess that judgment based on our estimation of what harm the government may or may not have suffered.").  When the defendant "furtively introduc[ed] large amounts of unreported cash into the financial system," he "frustrated a primary objective of the Bank Secrecy Act —— to ensure the maintenance of bank records necessary to the investigation and prosecution of criminal, tax, and regulatory offenses." United States v. Deskins, 2014 WL 670910, at *3 (W.D. Va. Feb. 20, 2014).

Defendant did not just structure a handful of deposits.  He was a serial structurer who sought to conceal more than $1 million in cash income.  Indeed, defendant's conduct took place over a 15-month period, in more than 200 transactions, at four different banks.  See id.; see also Deskins, 2014 WL 670910, at *3 ("Serial structuring is a more serious offense than a single failure to report.").  The lengths defendant went through to structure, which included involving his wife to make deposits on his behalf, and traveling to multiple banks on the same day or on consecutive days, were significant.  See Exhibit D, Day 2, Vol. II at 88-89 (defendant's wife testifying that both she and defendant made cash deposits).  Defendant also kept cash-counting machines and safes at his home and office, underscoring defendant's attentiveness to the limits that defendant admittedly knew would trigger currency transaction reports.  See Exhibit G (search warrant photos); Exhibit D, Day 1, Vol. I, at 98 (Vanessa Mayorga testifying that defendant had cash-counting machines at his medical practice).  Moreover, in a post-arrest interview, defendant himself admitted knowing about the $10,000 reporting requirement.

15

Exhibit D, Day 2, Vol. I, at 95.  The jury found that defendant
deliberately flouted that requirement.

        2.   Defendant's Structuring Allowed Him to Conceal a
             Lucrative and Dangerous "Pill Mill"

    Defendant's motive to structure – indeed, his entire business
model – was based on concealing cash received for opioid
prescriptions.  Despite being placed on probation by the MBC in 2011,
defendant's greed, coupled with his ability to use his medical
license to provide a virtually unlimited supply of narcotics
(courtesy of Medicare),[4] drove him to conceal the true nature of
prescribing decisions that posed a substantial threat to the public.

    As detailed above, during the Structuring Period, defendant
issued approximately 6,559 prescriptions for opioid narcotics to 328
Medicare beneficiaries.  Defendant routinely prescribed high dosages
of both Oxymorphone and Oxycodone at the same time to the same
patients, month after month, sometimes without ever having seen those
patients – despite receiving $500 cash per "visit."  Even though pain
management specialists are expected to use the lowest effective dose
of opioids to control for risk of serious harm to patients (such as
drug overdoses), defendant regularly prescribed the highest available
strength of opioid analgesics to his patients (often without even
seeing them) because he knew he could be paid in cash.  Defendant's
recklessness was glaring: 72 percent of defendant's patients were

_____

    [4] During the Structuring Period, Medicare Part D paid
$2,924,846.09 for all controlled substances prescriptions written by
defendant.  Exhibit F at 2.

                                  16

prescribed opioid analgesics in a dosage that more than tripled their risk of opioid-related mortality.

Defendant profited handily from his conduct, obtaining more than $1.2 million during the Structuring Period, all of which defendant sought to conceal from the MBC and other authorities.

**B.    The History and Characteristics of Defendant**

Defendant is a first-time offender who will be 48 years old at the time of sentencing.  PSR ¶ 39.  He is a licensed physician, graduating from Louisiana State University in New Orleans in 1994. PSR ¶ 52.  Defendant has made a significant amount of money as a medical doctor, with a total net worth of $2,482,171.  PSR ¶ 56.

As noted above, in 2011, prior to the Structuring Period, the MBC charged defendant with "gross negligence, repeated negligent acts, excessively prescribing narcotic medications without an appropriate prior examination or period evaluations, failure to maintain adequate and accurate medical records of services provided," and for inappropriately using prescription forms "from a facility [with] which he was no longer affiliated[.]"  PSR ¶ 50.  Defendant admitted that these allegations made out a *prima facie* case for the imposition of discipline, but his license revocation was stayed for a period of three years of probation.  Exhibit E at 4, ¶ 9.  In addition, in October 2007, the MBC charged defendant with failing to release the medical records of five patients after having received valid patient releases.  PSR ¶ 51.  Defendant was fined $25,000.  PSR ¶ 51.

The fact that defendant was a medical doctor on MBC probation at the time of the offense should be taken as an aggravating factor. The authority conferred on medical doctors allowed defendant to sell drugs in a way that a street dealer never could.  Defendant abused the position of power and responsibility granted to him by society in order to target and endanger others for his own personal enrichment. Defendant's age and education should also be treated an aggravating factor.  Despite many years of medical practice and despite enjoying all the privilege and financial success that had come with it (including a net worth of more than $2 million), defendant chose to engage in a lengthy scheme to conceal income and endanger the lives of patients and anyone else who may have obtained drugs prescribed by defendant, and all for no reason other than to reap additional profit.  Defendant violated not only the law but the first and most fundamental principle of medicine: above all, do no harm.  Yet defendant doled out dangerous levels of opioids for cash again and again, day after day, throughout the Structuring Period.

Indeed, unlike other defendants who appear before this Court – those whose judgment are affected by youth, poverty, lack of education, or lack of opportunities - defendant has no excuse for his crimes.  Given his privilege and education, defendant's conscious choice to compromise the health of his patients in exchange for hundreds of thousands of dollars in cash, broken down into hundreds of deposits over and over again at multiple banks throughout the Structuring Period, sheds more light on his character than can any other fact.

**C.   The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence and Protect the Public from Further Criminal Conduct**

The need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public all support a 37-month sentence. See 18 U.S.C. § 3553(a)(A)-(D).  Structuring is a serious offense, all the more so given that defendant was driven to commit the crimes so that he could continue to exploit his position as a doctor and reap profits from a medical practice that endangered the public. Moreover, specific deterrence militates in favor of a significant sentence here, given that defendant's conduct came after – and was designed to avoid – probation imposed by the MDC for excessively prescribing narcotics.  A significant sentence in this case will also have important general deterrence value, and comes at a time of need for a message to be sent that this level of corruption by physicians will not be tolerated.  As the CDC has reported, "[d]rug overdose deaths and opioid-involved deaths continue to increase in the United States," having quadrupled since 1999.  Exhibit H at 1-2.  Overdoses involving opioids killed more than 28,000 people in 2014, and over half of those deaths were from prescription opioids.  Id.  From 1999 to 2015, more than 183,000 people have died in the United States from overdoses related to prescription opioids.  Id. at 3.  Moreover, a study by the Los Angeles Times concluded that prescription drug addiction causes "a substantial burden on hospitals and the economy," including costing $1.4 billion to hospitals in 2010 based on 92,200 hospital visits.  Exhibit I at 1-2.

19

Because opiate controlled drugs can have medicinal value - such as in treating the severe pain from cancer, recent surgery, or in palliative care - the law carves out an exception allowing such drugs to be prescribed by doctors who act with a legitimate medical purpose.  The law places extraordinary trust in physicians: they are the primary safeguard to ensure that these drugs go to patients who truly need them.  Defendant, a medical doctor, stands before the Court having engaged in a pervasive pattern through which he endangered patients' lives to turn a profit, and to conceal that profit from medical regulators, financial regulators, and law enforcement.

Moreover, at the time of the first structured deposit charged in this case, defendant had already admitted that the MDC established a *prima facie* case of excessively prescribing narcotics.  Rather than take his MBC probation as a lesson and reform his behavior, defendant continued his criminal practice and structured more than one million dollars in cash to cover his tracks and conceal his offense conduct.

Indeed, that pattern of concealment appears to have continued even *after defendant's trial and conviction*.  Between November 14, 2016 and December 20, 2016, 32 separate money orders totaling $28,000 were purchased and ultimately used to pay off American Express credit cards held by defendant.  As Agent Glover explains, "[t]he money orders appear to have been structured to evade recordkeeping and reporting requirements, as they were purchased in multiple transactions under $3,000, respectively, often at different locations

on the same day or near consecutive days."  Exhibit J ¶ 3.[5]  For

example, shortly after defendant was convicted, all of the following

cash-purchased money orders were used to make payments on defendant's

credit cards:

- 11/19/2016: cash purchase of $4,000 in Money Orders at 2 different post office locations

- 11/21/2016: cash purchase of $4,000 in Money Orders at 2 different post office locations

- 11/22/2016: cash purchase of $4,000 in Money Orders at 2 different post office locations

- 11/23/2016: cash purchase of $6,000 in Money Orders at 3 different post office locations

- 11/30/2016: cash purchase of $2,500 in Money Orders at 2 different post office locations

Id. ¶ 4; Exhibit 1.  The structuring pattern above is remarkably

similar to that for which defendant was convicted:  the only

difference is that the transactions involve post offices – with a

lower reporting threshold – rather than banks.  But the money still

flowed to defendant.  In fact, the post-conviction money order

---

[5] Under the reporting requirements set forth in 31 U.S.C. § 5325, "financial institution[s]" – including the United States Postal Service – are prohibited from issuing certain monetary instruments, including money orders, to any individual in connection with a single transaction or a group of transactions involving $3,000 or more unless it (1) verifier's the purchaser's identity and (2) maintains records of, among other information, the name, date, and amount of the purchase of the instrument.  See 31 U.S.C. § 5325; 31 C.F.R. § 103.29(b); see also United States v. One Hundred Thirty Three (133) U.S. Postal Service Money Orders, 780 F. Supp. 2d 1084, 1093 (D. Hawaii 2011).

transactions also parallel those described in Agent Glover's May 2016 search warrant affidavit, which identified 291 postal money orders that were similarly purchased and ultimately used to pay defendant's business and personal bills.[6]

The Court must send a message that this conduct will not be tolerated, and that any physician who goes down the same path of avoiding financial reporting requirements in order to conceal prescription abuse for profit will be met with a severe penalty.

**D.   The Court Should Impose a Fine of $1,356,788**

The Sentencing Guidelines fine range for defendant is from $7,500 to $75,000. PSR ¶ 70. The statutory maximum fine that can be imposed by the Court is $7,250,000. PSR ¶ 68. During the Structuring Period, the evidence showed that defendant made structured deposits of $1,217,213 in cash, well in excess of the high-end of the Guidelines range. As set forth above, the evidence at trial linked these deposits to defendant's cash-for-prescription business.

---

[6] Pursuant to U.S.S.G. § 1B1.3, relevant conduct for the purposes § 2B1.1(b) includes all acts committed "during the commission of the offense of conviction, in preparation for that offense, *or in the course of attempting to avoid detection or responsibility for that offense*." Id. § 1B1.3(a)(1) (emphasis added). The money order purchases here plainly qualify as "relevant conduct" under the Guidelines. See also United States v. Tanke, 743 F.3d 1296, 1306 (9th Cir. 2014) (rejecting argument that false testimony occurring four years after end of fraudulent scheme was not relevant conduct); *accord* United States v. Rivera-Gomez, 634 F.3d 507, 513 (9th Cir.2010) (concealing conduct that "occurred long after the" initial offense is still covered by the Sentencing Guidelines, because "nothing in the Guidelines establishes that conduct ceases to be relevant after a specified period of time").

"Under the advisory Guidelines, a court may impose a fine 'in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.'" <u>United States v. Orlando</u>, 553 F.3d 1235, 1239 (9th Cir. 2009) (quoting U.S.S.G. § 5E1.2(a)); <u>see also</u> 18 U.S.C. § 3571.  The district court must consult the Guidelines' recommendation, the § 3553(a) factors, and the 18 U.S.C. § 3572(a) factors[7] to determine the appropriateness of the imposition of a fine and its amount.  <u>See United States v. Eureka Labs., Inc.</u>, 103 F.3d 908, 913–14 (9th Cir. 1996).  Application Note 4 to U.S.S.G. § 5E1.2 provides that "where a sentence within the applicable fine guideline range would not be sufficient to ensure both the disgorgement of any gain from the offense that otherwise would not be disgorged (<u>e.g.</u> by restitution or forfeiture), and an adequate punitive fine, an upward departure from the fine guideline range may be warranted."

---

[7] 18 U.S.C. § 3572(a) instructs courts to consider the following factors:  (1) defendant's income, earning capacity, and financial resources;  (2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;  (3) any pecuniary loss inflicted upon others as a result of the offense;  (4) whether restitution is ordered or made and the amount of such restitution;  (5) the need to deprive the defendant of illegally obtained gains from the offense;  (6) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence;  (7) whether the defendant can pass on to consumers or other persons the expense of the fine; and (8) if the defendant is an organization, the size of the organization and any measure taken by the organization to discipline any officer, director, employee, or agent of the organization responsible for the offense and to prevent a recurrence of such an offense.

23

Here, because there is no applicable restitution or forfeiture available or sought at this time (PSR ¶¶ 72-73), the Court should upwardly depart from the high-end of the Guidelines range and impose a fine of $1,356,788.  Such a fine would account for the $1,217,213 in structured cash deposits made by defendant during the Structuring Period, which were tied to the cash payments defendant received in exchange for writing opioid prescriptions at his clinic.  A $1.3 million fine would also take into account the costs of a 37-month term of incarceration ($98,605), as well as a three-year period of supervised release ($40,970).  PSR ¶ 71.  See U.S.S.G. § 5E1.5.

In addition, defendant has a reported net worth of at least $2,482,171.  PSR ¶ 56.  Given his assets, defendant can afford to pay a substantial fine, and the Court should impose one that is commensurate with the pattern of serial structuring that defendant designed to conceal his lucrative "pill mill" from authorities over a significant period of time.  See Orlando, 553 F.3d at 1240 (affirming district court's conclusion that "a fine was particularly appropriate" a crime "where restitution is not ordered.").

**E.   The Court Should Order Defendant to Surrender his DEA License as a Condition of Supervised Release**

Finally, pursuant to U.S.S.G. § 5F1.5, the Court may restrict defendant's ability to prescribe controlled substances while on supervised release if the Court determines that: (1) a reasonably direct relationship existed between the defendant's occupation and the conduct relevant to the offense of conviction; and (2) the restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, defendant

24

will continue to engage in unlawful conduct similar to that for which

defendant was convicted.  See U.S.S.G. § 5F1.5(a)-(b).

Here, as explained above, defendant's structuring was directly related to his ability to prescribe Schedule II narcotics in exchange for cash.  Legally, defendant would not have that ability without his DEA registration, the licensure that doctors must have to handle controlled substances under the Controlled Substances Act ("CSA").  See 21 U.S.C. § 822(a)(2).[8]  Given that defendant was already on probation for his alleged excessive narcotics prescriptions throughout the Structuring Period, there is also reason to believe that, without a revocation of defendant's DEA license, defendant would continue to conceal any future cash payments he could receive as a doctor as a direct result of prescribing opioid analgesics.  See also United States v. Clark, 195 F.3d 446, 452 (9th Cir. 1999) (affirming probation condition restricting defendant from associating with the practice of law because it was "directly related to the offense" and reasonably necessary to protect the public).

In fact, because not all prescriptions issued by a physician qualify as controlled substances under the law, cf., e.g., Cal. Health & Saf. Code § 11150 (prohibiting anyone other than medical professionals such as doctors and nurses from "writ[ing] or iss[uing] a prescription") (emphasis added) with id. § 11153 (imposing

---

[8] Controlled substances (such as Oxycodone and Oxymorphone) are placed on schedules under the CSA in one of five schedules "based on their potential for abuse or dependence, their accepted medical use, and their accepted safety for use under medical supervision."  Gonzales v. Oregon, 546 U.S. 243, 250 (2006).

25

1  additional limitations on a "prescription for a *controlled*

2  *substance*") (emphasis added), requiring defendant to surrender his

3  DEA license for a period of three years – rather than barring him

4  from the practice of medicine altogether – is a relatively more

5  limited restriction on defendant's occupation that would still

6  protect the public, as contemplated by U.S.S.G. § 5F1.5(b).

7       Consistent with the evidence of intent to structure and the

8  jury's guilty verdict, defendant should be ordered to surrender his

9  DEA registration to pretrial services no later than February 21,

10  2017.  He should also be ordered not to handle, prescribe, or

11  otherwise dispense any controlled substances as defined under the

12  Controlled Substances Act, 21 U.S.C. §§ 801-971, including but not

13  limited to Schedule II controlled substances, for the duration of any

14  term of supervised release imposed by the Court.

15  **V.    CONCLUSION**

16       The government recommends that defendant be sentenced to a 37-

17  month term of incarceration, followed by a three-year period of

18  supervised release, ordered to pay a fine of $1,356,788, a $2,900

19  special assessment, and to surrender his DEA registration at the time

20  of sentencing through the duration of any term of supervised release.

21

22  Dated:    February 14, 2017          Respectfully submitted,

23                                       ____/s/_____
                                         DAMARIS M. DIAZ
24                                       WILLIAM M. ROLLINS
                                         Assistant United States Attorneys
25
                                         Attorneys for Plaintiff
26                                       UNITED STATES OF AMERICA

27

28                                26