EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
DAMARIS M. DIAZ (Cal. Bar No. 277524)
WILLIAM M. ROLLINS (Cal. Bar No. 287007)
Assistant United States Attorneys
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-0302/7407
     Facsimile:  (213) 894-0141
     E-mail:     damaris.diaz@usdoj.gov
                 william.rollins@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 16-320-RGK |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT WASHINGTON BRYAN II'S MOTION FOR BAIL PENDING APPEAL |
| v. | |
| WASHINGTON BRYAN II, | Hearing Date:  2/21/17 |
| Defendant. | Hearing Time:  10:00 a.m. |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby files its Opposition to Defendant Washington Bryan II's Motion for Bail Pending Appeal.  The Opposition is based on the enclosed memorandum of points and authorities, the exhibits thereto,

//
//
//
//

the indictment, the records and files in this case, and any argument
the Court may adduce at the hearing on this matter.


 Dated: February 15, 2017          Respectfully submitted,


                                   EILEEN DECKER
                                   United States Attorney

                                   LAWRENCE S. MIDDLETON
                                   Assistant United States Attorney
                                   Chief, Criminal Division


                                        /s/
                                   _____
                                   DAMARIS M. DIAZ
                                   WILLIAM M. ROLLINS
                                   Assistant United States Attorneys

                                   Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.   INTRODUCTION...................................................1

II.  ARGUMENT......................................................2

    A. THE APPLICABLE LEGAL STANDARD CREATES A PRESUMPTION OF
       DETENTION IN THIS CASE ....................................2

    B. DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE HE HAS NOT
       MET HIS BURDEN OF PROVING THAT HE IS NOT A FLIGHT RISK
       OR DANGER TO THE COMMUNITY ...............................3

    C. DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE HE HAS NOT
       MET HIS BURDEN OF PROVING THAT THE APPEAL RAISES A
       SUBSTANTIAL QUESTION OF LAW LIKELY TO RESULT IN REVERSAL
       OR AN ORDER FOR A NEW TRIAL ..............................9

       1.  Dr. Thatcher Qualifies as an Expert Witness ..........10

       2.  Dr. Thatcher's Testimony was Properly Admitted Under
          Rules 403 and 404(b) . . . . . . . . . . . . . . . . 16

III. CONCLUSION...................................................24

i

1

<strong>TABLE OF AUTHORITIES</strong>

2

CASES                                                              PAGE(S)

3

Daubert v. Merell Dow Pharmaceuticals,
        509 U.S. 579 (1993)....................................11

4

Huddleston v. United States,
        485 U.S. 681 (1988)....................................22

5

Mukhtar v. Cal. State Univ., Hayward,
        299 F.3d 1053 (9th Cir. 2002)..........................14

7

Ratzlaf v. United States,
        510 U.S. 135 (1994)....................................18

8

United States v. Alatorre,
        222 F.3d 1098 (9th Cir. 2000)..........................12

10

United States v. Anderson,
        741 F.3d 938 (9th Cir. 2013)...........................17

11

United States v. Banks,
        514 F.3d 959 (9th Cir. 2008)...........................22

13

United States v. Beckman,
        298 F.3d 788 (9th Cir. 2002)...........................17

14

United States v. Blitz,
        151 F.3d 1002 (9th Cir. 1998)..........................21

16

United States v. Cherer,
        513 F.3d 1150 (9th Cir. 2008)..........................23

17

United States v. Curtin,
        489 F.3d 935 (9th Cir. 2007)...........................22

19

United States v. Daniels,
        760 F.3d 920 (9th Cir. 2014)...........................12

20

United States v. DeGeorge,
        380 F.3d 1203 (9th Cir. 2004)......................20, 21

22

United States v. Gebro,
        948 F.2d 1118 (9th Cir. 1991)...........................9

23

United States v. Hadley,
        918 F.2d 848 (9th Cir. 1990)...........................23

24

United States v. Handy,
        761 F.2d 1279 (9th Cir. 1985).......................3, 10

26

United States v. Hankey,
        203 F.3d 1160 (9th Cir.2000)...........................11

28

ii

**TABLE OF AUTHORITIES (CONT'D)**

PAGE

United States v. Lan Thi Tran Nguyen,
     502 Fed. Appx. 678 (9th Cir. 2012)............................16

United States v. Lozano,
     623 F.3d 1055 (9th Cir. 2010)................................22

United States v. MacPherson,
     424 F.3d 183 (2d Cir. 2005)..................................18

United States v. McCahill,
     765 F.2d 849 (9th Cir. 1985)..................................4

United States v. McCaleb,
     552 F.3d 1053................................................11

United States v. Merrill,
     513 F.3d 1293 (11th Cir. 2008)...............................19

United States v. Miller,
     753 F.2d 19 (3d Cir. 1985)...............................passim

United States v. Myers,
     804 F.3d 1246 (9th Cir. 2015)............................12, 13

United States v. One Hundred Thirty Three (133) U.S. Postal
     Service Money Orders,
     780 F. Supp. 2d 1084 (D. Hawaii 2011).........................6

United States v. Pang,
     362 F.3d 1187 (9th Cir. 2004)................................18

United States v. Ramirez-Jiminez,
     967 F.2d 1321 (9th Cir. 1992)................................17

United States v. Reynolds,
     956 F.2d 192 (9th Cir. 1992)...............................7, 9

United States v. Serang,
     156 F.3d 910 (9th Cir. 1998).................................17

United States v. Skillman,
     922 F.2d 1370 (9th Cir. 1990)................................23

United States v. Sneezer,
     983 F.2d 920 (9th Cir. 1992).................................21

United States v. Soliman,
     813 F.2d 277 (9th Cir. 1987).................................17

United States v. Taylor,
     2016 WL 805638 (2d Cir. 2016)................................18

United States v. Vo,
    413 F.3d 1010 (9th Cir. 2005)..................................22

United States v. Williams,
    989 F.2d 1061 (9th Cir. 1993)..................................17

STATUTES

18 U.S.C. § 3143.................................................3

18 U.S.C. § 3143(b)(1)...........................................3

18 U.S.C. § 3143(b)....................................1, 2, 4, 10

31 U.S.C. § 5325..............................................5, 6

RULES

Fed. R. Evid. 403...............................................16

Fed. R. Evid. 404(b)............................................21

Fed. R. Evid. 702...............................................14

Fed. R. Evid. 704(a)............................................14

REGULATIONS

31 C.F.R. § 103.29(b).........................................5, 6

iv

1                    **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.    INTRODUCTION**

3        Defendant Washington Bryan II ("defendant") asks this Court to

4  allow him to remain on bond pending appeal of his convictions

5  because, according to defendant, his appeal raises substantial issues

6  likely to result in reversal and a new trial.  He also claims –

7  without any credible or admissible evidence – that his patients would

8  be in jeopardy as a result of his incarceration, and that he has

9  "adjusted his [medical] practice" to remove any "possible concerns,"

10  by refusing to take "cash payments" from his patients and is "only

11  accepting referrals from reputable doctors[.]"  (Mot. at 9-10.)

12        The Court should reject each of these arguments.

13        First, because defendant's motion is not supported by any

14  credible or admissible evidence, defendant has not met his burden of

15  showing that he does not pose a flight risk or danger to the

16  community by "clear and convincing" evidence under 18 U.S.C.

17  § 3143(b).  For that reason alone, the Court should deny his motion.

18        Second, defendant has continued to structure his income.  In

19  fact, the week of defendant's trial, *and even after his conviction*,

20  defendant structured or aided and abetted in structuring about

21  $28,000 in postal money orders – all in amounts below the $3,000

22  reporting threshold – and used the funds to pay off his own American

23  Express credit card accounts.  During that same period, defendant

24  continued to prescribe unusually high doses of opioid narcotics,

25  consistent with the evidence introduced at trial.

26        Finally, even if defendant could establish that the § 3143(b)(A)

27  factors favored his release (he cannot), detention would still be

28

warranted because defendant has failed to and cannot identify a "substantial issue" on appeal that is likely to result in reversal.

Accordingly, defendant's motion for bail pending appeal should be denied.

## II. ARGUMENT

### A. THE APPLICABLE LEGAL STANDARD CREATES A PRESUMPTION OF DETENTION IN THIS CASE

Under 18 U.S.C. § 3143(b), a defendant who seeks to appeal his conviction or sentence <u>must</u> be detained, unless the judicial officer finds:

> (A)  by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; **and**

> (B)  that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in –

> (i) reversal,

> (ii) an order for a new trial,

> (iii) a sentence that does not include a term of imprisonment, or

> (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1) (emphasis added); <u>see also</u> <u>United States v. Handy</u>, 761 F.2d 1279, 1283 (9th Cir. 1985).

"Once a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even permit it in the absence of exceptional circumstances."  H. Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970) (regarding model for

2

current 18 U.S.C. § 3143, quoted in United States v. Miller, 753 F.2d 19, 22 (3d Cir. 1985) (stating that Congress enacted § 3143 "to reverse the presumption in favor of bail")); see also Handy, 761 F.2d at 1283 (adopting the "interpretation of the 1984 Bail Act first set forth by the Third Circuit in Miller"). To the contrary, there are compelling reasons for the law to *deny* release pending appeal in most cases:

> First and most important, the conviction, in which the defendant's guilt of a crime has been established beyond a reasonable doubt, is presumably correct in law, a presumption factually supported by the low rate of reversal in the Federal System. Second, the decision to send a convicted person to jail, and thereby reject all other sentencing alternatives, by its very nature includes a determination by the sentencing judge that the defendant is dangerous to the person or property of others, and dangerous when sentenced, not a year later, after the appeal is decided. Third, release of a criminal into the community, even after conviction, destroys whatever deterrent effect remains in the criminal law.

Miller, 753 F.2d at 22.

Before the Bail Reform Act of 1984, a district court could deny bail pending appeal only if it appeared that the appeal was frivolous or was taken for purposes of delay. United States v. McCahill, 765 F.2d 849, 850 (9th Cir. 1985). No longer. The revised statute was intended to make it more difficult for a defendant to obtain bail pending appeal. Id.

**B. DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE HE HAS NOT MET HIS BURDEN OF PROVING THAT HE IS NOT A FLIGHT RISK OR DANGER TO THE COMMUNITY**

Defendant cannot overcome the risk of flight presented by the jury's round rejection of his defenses and this Court's potential imposition of a significant term of incarceration. He also cannot

show that he is unlikely to pose a danger to the community under 18 U.S.C. § 3143(b).  Indeed, defendant did not attach any evidence whatsoever in support of his motion for bond pending appeal.

Defendant claims that he does not pose a danger to the community or a flight risk because "there have been no allegations of misconduct or failure to comply with pretrial services" during the pendency of this case through trial. (Def. Mot. at 8.)[1]  After defendant filed his motion, however, the government discovered that defendant appears to be *continuing* to engage in (or aid and abet) structuring.  In fact, beginning around the time that defendant was on trial in this case – and *even after he was convicted* – about $28,000 in postal money orders were used to pay off American Express credit cards held in defendant's name during November and December of 2016.  Exhibit B (Statement of IRS Agent Bryan Glover) ¶ 3; Exhibit C (Analysis of Post-Conviction Money Order Transactions); Exhibit D (Images of Postal Money Orders).  Similar to the offenses of conviction, each of these transactions fell below reporting requirements (which, in the case of postal money orders, is $3,000). See 31 U.S.C. § 5325; 31 C.F.R. § 103.29(b).

The day before defendant's trial began, for example, $4,000 in postal money orders were purchased at two different post offices (located less than two miles apart) and then used to pay off

_____

[1] Of course, if failing to flee while being out on bond were all it took to establish by clear and convincing evidence that a defendant is not a flight risk pending appeal, then nearly every defendant who made it to the sentencing phase after having been on pretrial release would automatically be entitled to bail pending appeal.  That is plainly not the law, as it would negate the shifted presumption against such release in § 3143(b)(1).

defendant's credit card.  Exhibit C.  Similarly, on November 22, 2016 – the week after defendant was convicted of 29 counts of structuring – another $4,000 in postal money orders were purchased at two different post offices, later used to send payments to defendant's American Express accounts.  Id.  Once again, these two post offices were less than two miles apart.  Id.  The following day, November 23, 2016, through six different transactions at three different post offices in Los Angeles, another $6,000 in postal money orders were obtained and later used to make additional payments to defendant's American Express accounts.  Id.  Two of these post offices were less than a mile apart (one on Motor Avenue in Los Angeles and another on Culver Boulevard in Culver City), and another was less than two miles away from those locations.  Id.

Had these transactions all occurred at a single post office, they would have triggered reporting requirements under federal law. Instead, because no more than $3,000 was purchased at multiple post offices, no currency transaction reports were required, and the post offices were not required to record the purchaser's identity.[2]  These

---

[2] Under the reporting requirements set forth in 31 U.S.C. § 5325, "financial institution[s]" – including the United States Postal Service – are prohibited from issuing certain monetary instruments, including money orders, to any individual in connection with a single transaction or a group of transactions involving $3,000 or more unless it (1) verifier's the purchaser's identity and (2) maintains records of, among other information, the name, date, and amount of the purchase of the instrument.  See 31 U.S.C. § 5325; 31 C.F.R. § 103.29(b); see also United States v. One Hundred Thirty Three (133) U.S. Postal Service Money Orders, 780 F. Supp. 2d 1084, 1093 (D. Haw. 2011).

5

transactions plainly undermine defendant's unsupported assertion that he no longer takes "cash payments" from his patients.  Mot. at 9-10.[3]

Of course, this more recent evidence also parallels the overall pattern and history of structuring at trial, which showed that defendant deposited more than $1.2 million in cash payments for narcotics prescriptions at multiple banks in Los Angeles.  Between October 2011 and January 2013 (the "Structuring Period"), defendant engaged in or aided and abetted at least 200 transactions designed to avoid federal reporting requirements, frequently traveling to two or three different banks in a single day, sometimes just minutes apart.  Exhibit E (Summary of All Cash Deposits) at 1; Exhibit F at 2-4 (Surveillance Photos).  Defendant also made below-reporting-threshold cash deposits at two separate banks within an hour of each other, and sometimes within just minutes of each other.  Exhibit G (Indicted Deposits) at 1-3.  In light of the evidence at trial – and the fact that defendant appears to be continuing to structure postal money orders, even after his conviction – defendant clearly poses an ongoing threat to the community.  See United States v. Reynolds, 956 F.2d 192, 192 (9th Cir. 1992) (the threat of economic harm can constitute a danger to the community).

Defendant's incentive to structure was – and remains – even more

_____

[3] Because defendant charged patients $500 cash per "visit" (as discussed further below), the fact that some money orders were purchased in greater amounts (e.g. $1,000) indicates that individual patients were not making these purchases.  And even assuming defendant were in fact receiving money order payments from his patients, he cannot explain why virtually untraceable money orders would mitigate the exact same "concerns" associated with cash payments.

dangerous: concealing the cash income he receives from prescribing dangerous narcotics.  Dr. Michelle Thatcher, a pharmacist and expert witness for the government, testified at trial that almost 72 percent of defendant's patients during the Structuring Period were on the "exact same regimen" of powerful opioid analgesics.  Exhibit H, Day 1, Vol. I at 45-46.  That regimen included immediate release, 30 milligram tablets of Oxycodone, dispensed in 240-unit doses for a 30-day supply, combined with 40 milligrams of Oxymorphone extended release tablets, dispensed in 120-unit doses for a 30-day supply.  Id. at 46.[4]

Even more troubling, these powerful narcotics were being refilled "month after month" for the same patients, all of whom were submitting claims to have Medicare cover the cost of their prescriptions.  Id.  Medicare Part B (provider) and Medicare Part D (pharmacy) claims data show, however, that defendant never made any claims for Medicare reimbursement for providing patient services for these individuals.  Id. at 72.

Instead, defendant's patients were paying him cash.  At trial, defendant's niece and former employee, Vanessa Mayorga, explained that "each appointment" to visit defendant for a prescription generally cost $500 in cash, regardless of whether defendant was even present to see each patient.  Exhibit H, Day 1, Vol. I at 90-93.

---

[4] These drugs combined to provide an astonishingly high "morphine-equivalent dose" (or "MED") of 840 milligrams per day.  An MED of 120 milligrams per day is considered a sign of over-utilization of morphine or narcotics, and an MED of 200 milligrams is associated with a *300 percent increase* in opioid-related mortality. 50.  Exhibit H at 45, 50.

Based on her personal observations at defendant's clinic during the Structuring Period, Ms. Mayorga said she believed that "every patient" got "at least one" prescription for "Oxy." Id. at 99. She also made clear that defendant's medical business often consisted of accepting cash payments for pre-written prescriptions for drugs, regardless of whether the patients or the doctor were actually present. Id. at 91-92.

*Even after defendant's conviction*, defendant has continued to demonstrate "a pattern of prescribing the highest available strength of opioid analgesics" to his patients. Exhibit A at 6. Between November 2016 and February 9, 2017, defendant continued to authorize the exact "same opioid analgesic regimens" to multiple beneficiaries, "dispensed with identical days and supply quantity." Id. at 5, 8. Of the 473 controlled substance prescription-drug event records authorized by defendant since his trial and conviction, 99.6% have been for opioid analgesics. Id. at 3. Defendant has also continued to prescribe a high volume of HIV medications, "which is inconsistent with the practice patterns of a pain medicine physician" because HIV is typically treated by physicians "practicing in internal medicine or infectious disease settings." Id. at 7-8. According to Dr. Thatcher, all of these more recent findings are "consistent with the findings that were identified in the previous review completed prior to [defendant's] conviction of federal charges related to structuring," and they remain consistent with potential fraud, waste,

8

1  and abuse.  Id.[5]

2      Finally, now that defendant has been convicted, he is faced with

3  the reality of a statutory maximum prison sentence of 145 years.

4  Defendant's knowledge that the jury rejected his defense and that he

5  is likely to serve time in prison makes it more likely that he will

6  flee.  See United States v. Gebro, 948 F.2d 1118, 1121-22 (9th Cir.

7  1991).

8      Because defendant cannot establish by clear and convincing

9  evidence that he is neither a flight risk or a danger to the

10  community, his motion for bail pending appeal should be denied.

11      **C.   DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE HE HAS NOT MET
             HIS BURDEN OF PROVING THAT THE APPEAL RAISES A SUBSTANTIAL**

12  **QUESTION OF LAW LIKELY TO RESULT IN REVERSAL OR AN ORDER
             FOR A NEW TRIAL**

13

14      Even if defendant could show that the 18 U.S.C. § 3143(b)

15  favored his release pending appeal, his motion should still be denied

16  because he is unlikely to prevail on appeal.  In establishing "a

17  substantial question of law or fact," the Ninth Circuit has explained

18  that the word "substantial" in the bail statute "defines the level of

19  merit required in the question raised on appeal, while the phrase

20  'likely to result in reversal' defines the type of question that must

21  be presented."  Handy, 761 F.2d at 1281 (emphasis omitted).  A

22  "substantial question" refers to a legal issue that is "fairly

23  _____

24      [5] In her recent analysis, Dr. Thatcher also explains that 93% of
    defendant's Medicare Part D beneficiaries between November 2016 and

25  February 2017 received a low-income subsidy to assist them in paying
    for the cost of a prescription.  Exhibit A at 7.  It is implausible

26  that such beneficiaries could routinely afford $500 cash payments
    (from a legitimate income source unrelated to drug diversion) for

27  "visits" with defendant each month.
                                        9

28

debatable" or "fairly doubtful," and is "of more substance than would be necessary to a finding that it is not frivolous."  <u>Id.</u> at 1283 (internal quotation marks omitted).

As the Ninth Circuit further recognized in <u>Handy</u>, there are no blanket categories for what questions constitute "substantial ones." <u>Id.</u> at 1282.  A court may find such a substantial question "only if it concludes that the question is so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." <u>Miller</u>, 753 F.2d at 23.  While the "substantial question" standard does not require the Court to find that reversal is more likely than not, <u>Handy</u>, 761 F.2d at 1280-81, neither is it so toothless that it eviscerates Congress' intent to "toughen the law with respect to bail pending appeal," <u>id.</u> at 1283.

### 1.   <u>Dr. Thatcher Qualifies as an Expert Witness</u>

Defendant first argues that his conviction is likely to be reversed and a new trial ordered because Dr. Thatcher purportedly offered improper expert testimony that defendant's prescribing habits fit those of a "pill mill." (Def. Mot. at 1-2.) Defendant claims that because Dr. Thatcher knew "nothing of [defendant's] patients or methods of treatment," she "necessarily" lacked the training to state "whether Dr. Bryan was sufficiently trained to treat HIV patients" or whether defendant's prescription patterns were "unusual." (<u>Id.</u>) Defendant is wrong.

Federal Rule of Evidence 702 allows for the admission of "scientific, technical, or other specialized knowledge" when "(1) the

testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." United States v. McCaleb, 552 F.3d 1053, 1060 (9th Cir. 2009.  A district court may rely on various factors in evaluating such evidence, including (1) whether the theory can be or has been tested; (2) whether the theory has been subjected to peer review; (3) whether the error rate is known and standards exist to control the operation of the technique; and (4) whether the theory has gained general acceptance.  Id. (citing Daubert v. Merell Dow Pharmaceuticals, 509 U.S. 579, 593-94 (1993)).  The Daubert factors need not be mechanically applied, and the court has "broad discretion when discharging [its] gatekeeping function." United States v. Hankey, 203 F.3d 1160, 1168 (9th Cir.2000).

Because defendant did not object to Dr. Thatcher's qualifications as an expert witness under Rule 702 in this case,[6] his argument that she lacked necessary information or training upon which to formulate her opinions is reviewed for plain error on appeal.  See United States v. Alatorre, 222 F.3d 1098, 1100 (9th Cir. 2000).  To meet this demanding standard, defendant must show: (1) error, (2) that is plain, and (3) that affects substantial rights.  United States v. Myers, 804 F.3d 1246, 1257 (9th Cir. 2015).  An error affects substantial rights only if it was "prejudicial" and "affected the outcome of the district court proceedings." United States v.

---

[6] While defendant objected to the government's proffered expert testimony under Rules 404(b) and 403, he did not object under Rule 702.  (Dkt. 42.)

11

<u>Daniels</u>, 760 F.3d 920, 925 (9th Cir. 2014).  If all three conditions are met, the Court of Appeals may exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." <u>Myers</u>, 804 F.3d at 1257.

Here, defendant cannot establish any error, let alone one that qualifies as "plain" in the Ninth Circuit.  Dr. Thatcher has been a doctor of pharmacy for nearly 20 years, having received her doctorate from the University of Iowa in 1997.  Exhibit I (Thatcher CV).  In her nearly two decades of experience as a pharmacist, Dr. Thatcher has served in a variety of capacities, including as a director of pharmacy service for Aetna, a director of Pharmacy for McLaren Oakland, and a guest-lecturer at Madonna University in Michigan. <u>Id.</u> Her experience has included providing consultation to physician groups and employers for their pharmacy programs, making clinical recommendations, analyzing Medicare data, and, most recently, providing "clinical support for investigations involving fraud, waste, and abuse ["FWA"] . . . in government healthcare programs" by "performing data analysis of provider claims" and identifying outliers "in claims data and identify[ing] trends and patterns for potential FWA."  <u>Id.</u>

In this case, Dr. Thatcher's expert report and testimony were based on, among other things, her own training and experience as a Doctor of Pharmacy, including her review of publicly-available articles and information from the Centers for Disease Control and the Drug Enforcement Agency; her firsthand review of defendant's

1  prescription drug event ("PDE") records from Medicare; defendant's
2  self-reported taxonomy according to the National Plan and Provider
3  Enumeration System ("NPPES"); and records from the Office of
4  Inspector General and the Medical Board of California related to
5  defendant (including the disciplinary proceedings against defendant).
6  See Exhibit J (Expert Report).

7        While defendant cites two pages of trial testimony to argue that
8  Dr. Thatcher provided improper opinions about defendant's HIV
9  practice, as well as his "unusual" pattern of prescriptions generally
10 (Def. Mot. at 2), he fails to explain why the absence of information
11 about specific, individual patient records renders her opinion
12 testimony about aggregate prescription data (and defendant's self-
13 reported specializations) inadmissible.  Dr. Thatcher herself readily
14 acknowledged that she did not review individual patient files when
15 she undertook her analysis, and that she did not have "access to
16 [defendant's] actual chart notes."  Exhibit H (Day 1, Vol. I at
17 62:18-19, 67:17, 72:20-25, 83); see also id. at 80 (Q. ("Doctor,
18 you're not a medical doctor, are you?  A. No, I'm a doctor of
19 pharmacy.").  Instead, her opinions and analysis drew largely on
20 aggregate "prescription drug event records" from the Centers for
21 Medicare and Medicaid Services covering the dates between which
22 defendant structured cash payments he received for those
23 prescriptions.  Id. at 37-38.

24        Regardless of any individual patient records, the ability to
25 analyze the significance of aggregate Medicare data – or the lack
26 thereof – plainly falls within the scope of Dr. Thatcher's training

27                                  13
28

and experience under Fed. R. Evid. 702.  Moreover, while Dr. Thatcher said that she would "typically" want to analyze patient-specific data through Medicare Part B records (submitted for patient visits) in addition to Part D records (submitted for prescription reimbursement) to determine whether certain types of pharmacological therapy were appropriate for patients, here there was no Part B data available for review at all because defendant submitted no medical claims to Medicare "or these patients [were] paying cash." Id. at 56, 72, 76-77.[7]  Ironically, it was precisely the absence of Part B data and individual patient claims that contributed to one of Dr. Thatcher's primary conclusions: the lack of such data suggested that beneficiaries may have been paying defendant cash rather than submitting claims to insurers.  Id. at 57.  Based on Dr. Thatcher's pharmacological training, expertise, and review of the aggregate prescription records relating to defendant, the absence of Part B claims was thus consistent with "pill mill" or drug diversion activity.  Id. at 57.

Contrary to what defendant implies in his motion, Dr. Thatcher's opinions also accounted for defendant's training and certification in HIV medicine.  Id. at 82, 92.  During her testimony, Dr. Thatcher explained that "even [if defendant had] a certification" for HIV

---

[7] To the extent defendant argues that Dr. Thatcher's testimony was improper because it embraced the ultimate issue of whether he intended to evade currency reporting requirements, he is also wrong. "It is well-established ... that expert testimony concerning an ultimate issue is not per se improper." Mukhtar v. Cal. State Univ., Hayward, 299 F.3d 1053, 1066 n. 10 (9th Cir. 2002). Indeed, Fed. R. Evid. 704(a) provides that expert testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

14

treatment, she <u>still</u> believed it would have been unusual for someone
like defendant, *i.e.* a pain medication physician, to engage in
defendant's high "level of HIV prescribing," and that it was "even
more highly unusual that there [were] no Medicare Part B claims" for
those sick patients requiring complex medical care.  <u>Id.</u> at 82.
(emphasis added).  That's because almost 72 percent of defendant's
patients were receiving the exact same prescriptions for two
different opioids that combined to provide an MED of 840 milligrams
per day, as noted above.  <u>Id.</u> at 45-46.[8]  Even more troubling, these
powerful narcotics were being refilled "month after month" for the
same patients, all of whom were submitting claims to have Medicare
cover the cost of their prescriptions.  <u>Id.</u>

        In other words, Dr. Thatcher's analysis and opinions were not
only based on adequate training, experience, facts, and data under
Rule 702, they also accounted for the absence of defendant's
individual patient treatment records, as well as the fact that
defendant had HIV training as a physician.  Nevertheless, Dr.
Thatcher concluded that defendant was still engaged in an unusual
pattern of "writing the highest available strength of [] opioid
analgesics or . . . pain medications" to patients.  <u>Id.</u> at 51.

        Because all of Dr. Thatcher's testimony was the product of
reliable principles and methods applied reliably to the facts of this
case, defendant cannot show a "substantial issue" of law or fact

---

        [8] As also noted above, an MED of 120 milligrams per day is
considered a sign of over-utilization of morphine or narcotics, and
an MED of 200 milligrams is associated with a <u>300 percent increase</u> in
opioid-related mortality.  Exhibit H at 45, 50.

likely to result in reversal.  See, e.g., United States v. Lan Thi
Tran Nguyen, 502 Fed. Appx. 678, 680 (9th Cir. 2012) ("[G]iven
Coyne's background as a pharmacist, her position on the Board, and
her fifteen years of experience investigating violations of pharmacy
law, the district court did not err in allowing her to testify as an
expert witness.").

> ### 2.   Dr. Thatcher's Testimony was Properly Admitted Under Rules 403 and 404(b)

In an attempt to re-litigate the Court's ruling on the
government's successful motion in limine seeking to admit expert
testimony regarding the prescriptions written by defendant, defendant
also argues that Dr. Thatcher's testimony should have been excluded
under Fed. R. Evid. 403 and 404(b) because "[n]othing in Dr.
Thatcher's testimony had anything to do with the offense of
structuring."  (Mot. at 5.)  Again, defendant is wrong.

> ### a.   Dr. Thatcher's Testimony Provided Direct Evidence of Defendant's Intent to Structure

Prior to trial, the Court correctly determined that the
government's proffered expert testimony was admissible. (Dkts. 33,
43, 63.)  Evidence is "'direct evidence,' [when it is] used to flesh
out the circumstances surrounding the crime with which the defendant
[is] charged, thereby allowing the jury to make sense of the
testimony in its proper context." United States v. Ramirez-Jiminez,
967 F.2d 1321, 1327 (9th Cir. 1992) (evidence of defendant's false
statements to agents "came in the course of the conduct with which he
was charged, and [was] probative of his consciousness that his
conduct was illegal"); United States v. Soliman, 813 F.2d 277, 279

16

(9th Cir. 1987) (evidence linking the defendant to the fraud committed by his supervisee was direct proof); see <u>United States v. Serang</u>, 156 F.3d 910, 915 (9th Cir. 1998) (evidence admissible if "necessary to . . . permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." <u>United States v. Anderson</u>, 741 F.3d 938, 949 (9th Cir. 2013); <u>United States v. Beckman</u>, 298 F.3d 788, 794 (9th Cir. 2002) (same).  Accordingly, "[t]he policies underlying Rule 404(b) [requiring 403 balancing] are inapplicable when offenses committed as part of a 'single criminal episode' become other acts simply because the defendant 'is indicted for less than all of his actions.'" <u>United States v. Williams</u>, 989 F.2d 1061, 1070 (9th Cir. 1993), (quoting <u>Soliman</u>, 813 F.2d at 279).

The elements of structuring are:

1. Defendant structured a currency transaction;

2. The transaction involved a financial institution;

3. The defendant did so with knowledge that the financial institution was legally obligated to report currency transactions in excess of $10,000; and

4. The defendant acted with the intent to evade that reporting requirement.

<u>United States v. Pang</u>, 362 F.3d 1187, 1193-4 (9th Cir. 2004).

Proof that defendant, on 29 occasions, deposited round-numbered stacks of cash at multiple banks, sometimes within minutes of each other or on the same days, during a relatively short period of time, played an important part in allowing the jury to infer defendant's criminal intent and knowledge.  However, while a pattern of

17

consistent behavior may allow a jury to infer that defendant intended to structure with knowledge of the reporting requirement, <u>United States v. Taylor</u>, 2016 WL 805638 (2d Cir. 2016), "[c]ertainly, *the criminal origin of structured funds*, to the extent it provides a motive for concealment from government authorities, may constitute an additional circumstance from which a jury can infer a defendant's knowledge of and intent to avoid [Cash Transaction Report] filings." <u>United States v. MacPherson</u>, 424 F.3d 183, 193 (2d Cir. 2005) (emphasis added).  Thus, as <u>MacPherson</u> shows, proof of defendant's health care fraud and drug diversion that generated the cash that defendant structured was relevant, direct proof of defendant's criminal intent and knowledge for structuring.

Moreover, the Supreme Court has stated that the anti-structuring law was designed to deter the underlying conduct that motivated defendant to structure. <u>Ratzlaf v. United States</u>, 510 U.S. 135, 145, n. 11 (1994) ("Congress sought principally to check through the legislation in question — not gambling at licensed casinos, but laundering money proceeds from drug sales or other criminal ventures.) <u>See</u> S. Rep. No. 99-433, pp. 1-2 (1986) (purpose of Act creating [anti-structuring statute] is to 'provide Federal law enforcement agencies with additional tools to investigate money laundering [and to] curb the spread of money laundering, by which criminals have successfully disguised the nature and source of funds from their illegal enterprises')."

All of Dr. Thatcher's testimony provided proof that defendant knowingly intended to structure hundreds of thousands of dollars in

cash that he earned from participating in a scheme to defraud Medicare through the diversion of opioid narcotics and HIV drugs.  As Dr. Thatcher explained, defendant was a prolific prescriber of highly addictive opioids with substantial street values, far-below any interpretation of a reasonable standard of care.  The data clearly showed multiple, repeated transgressions. These data were also typical of the data that are admissible in a case involving the illegal prescription of controlled narcotics. See, e.g., United States v. Merrill, 513 F.3d 1293, 1300-1301 (11th Cir. 2008) (affirming district court's order permitting government to introduce more than 33,000 prescriptions written by defendant physician for opioid and related narcotics to prove drug dealing and health care fraud).  All of this occurred in the wake of defendant's stipulated medical board disciplinary action, which dovetailed with the testimony of Vanessa Mayorga and Agent Glover establishing that defendant apparently learned nothing from that sanction except, of course, how to fly below the radar by structuring his cash deposits that were generated from cappers and drug diversion to avoid detection.

### b.    Dr. Thatcher Offered Testimony Intertwined With the Evidence of Structuring

Evidence may be considered inextricably intertwined where it (1) "constitutes part of the criminal transaction that serves as the basis for the criminal charge[s];" or (2) is "necessary . . . to permit the prosecutor to offer a coherent and comprehensible story

regarding the commission of the crime." <u>See, e.g.</u>, <u>United States v.</u>
<u>DeGeorge</u>, 380 F.3d 1203, 1219-20 (9th Cir. 2004) (emphasis added).

In <u>DeGeorge</u>, the defendant was charged with mail and wire fraud
for commissioning, insuring, and then scuttling a yacht to collect
the insurance.  The defendant had thrice before claimed insurance
losses for other yachts, one a theft and two others by sinking, over
the course of several years.  <u>Id.</u> at 1208.  The Ninth Circuit
rejected the government's characterization of the three prior
insurance claims as part of the "same transaction" charged because
they were "too far removed in both time and circumstance to be linked
with the alleged fraud in this case as part of a 'single criminal
episode.'"  <u>DeGeorge</u>, 380 F.3d at 1220 (citation omitted).  However,
the Ninth Circuit held that it was not an abuse of discretion for the
trial court to admit the prior claims under the second category of
"inextricably intertwined" evidence, i.e. to provide a comprehensible
story at trial, because "[t]he jury cannot be expected to make its
decision in a void—without knowledge of the time, place, and
circumstances of the acts which form the basis of the charge."  <u>See</u>
<u>id.</u> (concealing prior marine losses admissible for conspiracy count
to explain why defendant could not obtain insurance in his own name).

Here, it is somewhat of an understatement that the timing and
circumstances of defendant's opioid and HIV prescribing and record-
keeping practices informed the jury about why defendant saw fit to
structure hundreds of thousands of dollars in cash.  The government
did not seek to introduce many years' worth of such practices through
Dr. Thatcher's testimony.  Instead, Dr. Thatcher limited her analysis

20

and testimony to the timeframe that coincided with the Structuring

Period, and that analysis helped explain why defendant acted with the

requisite intent to evade reporting requirements:  to conceal

proceeds from excessively prescribing opioids.  Inclusion of Dr.

Thatcher's testimony thus allowed the government "to offer a coherent

and comprehensive story" about defendant's activities.  <u>DeGeorge</u>, 380

F.3d at 1219-20.

> c.   **<u>Dr. Thatcher's Testimony Was Admissible Under
> Fed. R. Evid. 404(b) as Evidence of Motive,
> Intent, and Knowledge</u>**

Rule 404(b) provides that evidence of "other crimes, wrongs, or

acts," while not admissible to prove bad character or propensity, may

be offered "for other purposes, such as proof of motive, opportunity,

intent, preparation, plan, knowledge, identity, or absence of mistake

or accident . . . ."  Fed. R. Evid. 404(b).  Rule 404(b) is a rule of

"inclusion," and the district court has wide discretion to decide

whether to admit such evidence.  <u>United States v. Blitz</u>, 151 F.3d

1002, 1007-08 (9th Cir. 1998); <u>United States v. Sneezer</u>, 983 F.2d

920, 924 (9th Cir. 1992) ("'evidence of other crimes is inadmissible

under this rule only when it proves nothing but the defendant's

criminal propensities . . . .'").  "Once it has been established that

the evidence offered serves one of these purposes . . . the 'only'

conditions justifying the exclusion of the evidence are those

described in Rule 403: unfair prejudice, confusion of the issues,

misleading the jury, undue delay, waste of time, or needless

presentation of cumulative evidence." <u>United States v. Curtin</u>, 489
F.3d 935, 944 (9th Cir. 2007) (en banc).

Evidence is admissible under Rule 404(b) if:

(1) the evidence tends to prove a material point;

(2) the prior act is not too remote in time;

(3) the evidence is sufficient to support a finding that the
defendant committed the other act; and

(4) (in cases where knowledge and intent are at issue) the act
is similar to the offense charged.

<u>United States v. Vo</u>, 413 F.3d 1010, 1018 (9th Cir. 2005) (internal
quotation marks omitted); <u>United States v. Lozano</u>, 623 F.3d 1055,
1059 (9th Cir. 2010) (quoting <u>United States v. Banks</u>, 514 F.3d 959,
976 (9th Cir. 2008)).

"Extrinsic acts evidence may be critical to the establishment of
the truth as to a disputed issue, especially when that issue involves
the actor's state of mind and the only means of ascertaining that
mental state is by drawing inferences from conduct." <u>Huddleston v.
United States</u>, 485 U.S. 681, 685 (1988). <u>See</u> <u>Curtin</u>, 489 F.3d at 944
("Rule 404(b) is a rule of inclusion - not exclusion - which
references at least three categories of other 'acts' encompassing the
inner workings of the mind: motive, intent, and knowledge."). If the
prior act is used to prove intent, it must be similar to the offense
charged. <u>United States v. Hadley</u>, 918 F.2d 848, 851 (9th Cir. 1990)
(citation omitted).

Here, Dr. Thatcher's testimony fell squarely within defined Rule
404(b) categories. It related solely to the Structuring Period,

22

proved that defendant excessively prescribed opioid medications (thereby having the motive and intent to structure), supported a finding that defendant in fact structured, and indicated that defendant knew of and intended to avoid currency reporting requirements.  Thus, her testimony met each of the prongs for admissibility under Rule 404(b), and was also received for its most logical and reasonable purpose: as direct evidence of structuring.

### d.   **The Testimony Was More Probative Than Prejudicial**

If the evidence satisfies Rule 404(b), "the court must then decide whether the probative value is substantially outweighed by the prejudicial impact under Rule 403." United States v. Cherer, 513 F.3d 1150, 1157 (9th Cir. 2008) (internal quotation marks omitted). The fact that a defendant's case will be harmed by the admission of the prior act evidence does not constitute unfair prejudice. United States v. Skillman, 922 F.2d 1370, 1374 (9th Cir. 1990).

Here, any potentially unfair prejudice was negated by the use of a limiting instruction to the jury.[9]  Hadley, 918 F.2d at 852. Moreover, Dr. Thatcher's testimony was prejudicial only in the sense that it revealed why defendant structured his cash deposits that represented the proceeds of illegal activity.  The prescription data during the Structuring Period allowed the jury to understand the nature of defendant's medical business at the time he oversaw more

---

[9] Here, the jury was instructed:  You may have heard evidence that defendant committed other crimes, wrongs, or acts not charged here. You may consider this evidence only for its bearing, if any, on the question of the defendant's intent, motive, opportunity, preparation, plan, knowledge, identity, absence of mistake or absence of accident, and for no other purpose.  (Dkt. 80 at 15.)

than 200 transactions designed to avoid currency reporting requirements.  Thus, it was no more or less prejudicial than any other elemental evidence, and it was extremely probative on the question of whether defendant acted with the intent to evading reporting requirements.

**III. CONCLUSION**

For all of these reasons, the government respectfully requests that the Court deny defendant's motion for bail pending appeal.

Dated: February 15, 2017            Respectfully submitted,

                                    EILEEN DECKER
                                    United States Attorney

                                    LAWRENCE S. MIDDLETON
                                    Assistant United States Attorney
                                    Chief, Criminal Division


                                      /s/
                                    _____
                                    DAMARIS M. DIAZ
                                    WILLIAM M. ROLLINS
                                    Assistant United States Attorneys

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

24