1  VICTOR SHERMAN (S.B.N. 38483)
   SHERMAN & SHERMAN
2  A Professional Law Corporation
   2115 Main Street
3  Santa Monica, CA 90405
   Telephone:  310/399-3259
4  Facsimile:  310/392-9029

5  Attorneys for Defendant,
   WASHINGTON BRYAN II
6

7              UNITED STATES DISTRICT COURT

8              CENTRAL DISTRICT OF CALIFORNIA

9                    WESTERN DIVISION

10  UNITED STATES OF AMERICA,      )   No. CR 16-320-RGK
                                   )
11          Plaintiff,             )   DEFENDANT'S REPONSE TO
                                   )   GOVERNMENT'S SENTENCING
12      v.                         )   POSITION AND REPLY TO
                                   )   OPPOSITION TO MOTION FOR
13                                 )   CONTINUED RELEASE PENDING
    WASHINGTON BRYAN II,           )   APPEAL; MEMORANDUM OF
14                                 )   POINTS AND AUTHORITIES;
            Defendant.             )   DECLARATION; EXHIBITS
15                                 )
                                   )
16                                 )   Date:    February 21, 2017
                                   )   Time:    10:00 a.m.
17                                 )   Place:   Courtroom of
                                   )            Hon. R. Gary Klausner
18  _____    )

19          Defendant Washington Bryan II, M.D., files his Response to the

20  Government's Sentencing Position and Replies to the Government's Opposition to

    his Motion for Continued Release Pending Appeal.
21

22

23

24

25

26

27

28

**A.** *Dr. Bryan Saw and Continues to See Seriously Ill Patients; There Is No Basis To Find that He Was Improperly Prescribing Medication*

As expected, the government keeps tying to turn this structuring case into a drug case.[1]  Aside from a pharmacist – not a doctor –  reviewing Medicare records without any information about Dr. Bryan's patients, the only evidence to support this insinuation was the testimony of Vanessa Mayorga who, though called by the government, completely validated the legitimacy of Dr. Bryan's practice.  Ms. Mayorga worked for Dr. Bryan for more than four years, from October 2011 to January 2016. Govt's Exhibit D (Day 1), at p. 89.  Ms. Mayorga is a licensed LVN and Dr. Bryan's niece by marriage.  *Id*. at pp. 88-89.  As she explained, there has been tension in the family since Dr. Bryan fired her mother in 2016 because he and his wife believed that she was stealing. *Id*. at pp. 100.

To support its claim that Dr. Bryan was running what it called a "pill mill," the government called Ms. Mayorga to state that a visit to the doctor cost $500 and that patients often paid in cash.  Government's Sentencing Position at p. 7.  On cross examination, however, Ms. Mayorga provided a different picture of Dr. Bryan's practice, including a carefully followed protocol.  Govt's Exhibit D (Day 2, Vol. I), at p. 46.

Whenever a patient arrived, Ms. Mayorga would take the patient to an examination room and take their vital signs and ask them medical questions before the doctor arrived to see them.  *Id*. at p. 52-53.  Everything was entered into the computerized MediNotes system that had terminals in all of the offices.  *Id*. at pp. 37, 52-53.  New patients were required to bring all of their medical records, which Ms. Mayorga described as voluminous, often two to three inches thick or more.

---

[1] It is beyond defendant's ability to completely refute the narcotics-related allegations because the government has left both him and the court flatfooted by having filed its sentencing memorandum just days before the sentencing.

1

Their office would generally scan only the prior two to five years.  *Id*. at pp. 41, 44.  Patient's identification was also scanned.  They would also obtain prescription records of all the patients' medications.  *Id*. at pp. 38, 42-43.

Because Dr. Bryan practices integrative medicine, combining Eastern and Western medicine, including acupuncture and massage, he specialized in very ill patients with severe pain and offered a holistic approach to their ailments.  Exhibit A.  Patients who needed things like cholesterol medicine that could be handled by a family practitioner were generally screened as inappropriate by Ms. Mayorga at intake.  Govt's Exhibit D (Day 2, Vol. I), at pp. 42.  Likewise, she would reject patients who could not account for the prior physicians that they had been seeing.  *Id*. at pp. 65.  Dr. Bryan had a very strict regimen for taking patients and obtaining supporting information for their conditions.

All of this information was entered into the computerized medical system that was audited by the California Medical Board as a result of Dr. Bryan's prior Medical Board probation.  Ms. Mayorga was aware of a couple of times when a Medical Board examiner would come to the office to insure that it was operating according to prescribed standards.  Although Dr. Bryan would want to make sure that everything looked as orderly as possible when there was an audit, he was casual about the auditors visits and did not take extraordinary steps to alter the appearance of his practice.  *Id*. at pp. 72-73, 74.

Typically, Dr. Bryan would see new patients twice.  The first time would be to screen them as to whether they were appropriate, assuming that Ms. Mayorga had not ruled them out on intake and the second time would be to make a more thorough determination of their condition.  *Id*. at p. 48.  Typically, the patients had HIV, cancer, diabetes or renal failure.[2]  Ms. Mayorga recalls a lot of cancer

---

[2] In addition to Integrative Medicine, Dr. Bryan is also certified or has a Board specialization in HIV, Pain Medicine, and Addiction.  Exhibit A.

patients, including patients with prostate, colon and anal cancer. *Id*. at pp. 53-54.
All of this information was in the copious medical records that the patients
produced. Ms. Mayorga would also ask them more about their medical histories,
including their specific ailments, hypertension, diabetes and allergies. *Id*. at p. 53.
She would generally accompany Dr. Bryan on his first visit with patients to see if
Dr. Bryan was accepting them before she started inputting information into the
computer. *Id*. at pp. 44, 49. Dr, Bryan would not take a patient before reviewing
his or her medical records, history and medications. *Id*. at pp. 45. Ms, Mayorga
never reported any instances where she found the doctor's interaction with a
patient to be inappropriate. *Id*. at pp. 49-50.

Over time she got to know patients, and the computerized system would
keep her up to date on when patients were scheduled or whether they had missed
an appointment. Patients who did not show up would be called to remind them to
reschedule an appointment.[3] *Id*. at p. 35. Although Ms. Mayorga testified that
some of the patients looked healthy, she clarified that the patients' records would
confirm that they were seriously ill. She also recalled that some of the patients
who looked healthy on intake appeared quite sick when they were at the end of
life. *Id*. at pp. 67-68.

Depending on the patient, Dr. Bryan would meet with them from five to 30
minutes when they came to the office. *Id*. at pp. 51-52, 56. There were no
instances that she mentioned when Dr. Bryan appeared to be anything other than

_____

[3] As Ms. Mayorga confirmed, Dr. Bryan was at the office most of the time.
*Id*. at pp. 55-56. Although the government claims that Ms. Mayorga believed that
Dr. Bryan wrote prescriptions in advance without seeing patients on the few
occasions that he was unavailable, this is actually inaccurate. *Id*. at p. 64. If
necessary, he saw patients in advance, wrote their prescriptions at that time, using
the same date, but required that they come back to get the prescription when it was
appropriate to refill. See attached Declaration of Karla Dosamante (Dosamante
Declaration).

3

1  professional with the patients he saw.  Both Ms. Mayorga and her mother needed
2  to be quite careful that the information that they entered into the computerized
3  medical records system was accurate, complete and verified . *Id*. at pp. 50-51.
4  This included information from a 14-page questionnaire that Ms. Mayorga
5  estimated patients took 30 minutes to an hour to fill out. *Id*. at pp. 46, 50  Ms.
6  Mayorga would insure that all necessary information was filled in. *Id*. at pp. 47.
7  At the beginning of every year patients had to resubmit their identification and
8  consent form.  They would also have to submit new information if a pharmacy
9  notified the office that they had changed their address. *Id*. at p. 39.  It was very
10  important for them to assure that the patient they were seeing was a real person.
11  *Id*. at pp. 45-46.

12      Since the office did not take insurance and did not have a medical biller,
13  patients often paid in cash. *Id*. at p. 69.  Because Ms. Mayorga and her mother
14  knew in advance from the computerized appointment schedule who would be in
15  the office, they filled out Post-It notes in advance and put the patient payments in
16  envelopes with the Post-It notes. *Id*. at p. 37.  They always offered patients
17  receipts.  No one was ever refused a receipt. *Id*. at pp. 58-59.[4]

18  **B.   *The Disciplinary Action Taken by the Medical Board in 2010 Has***
19      ***Nothing to Do with the Nature of Dr. Bryan's Practice from October 2011***
20      ***to January 2013***

21      It is only because the government wants to treat a structuring case as a drug
22  case that it has brought up the State Medical Board's administrative action against
23  Dr. Bryan, one that allowed him to continue practicing medicine and prescribing
24  controlled subtances under conditions that included monitoring by an independent

---

27      [4] Many HIV patients with insurance are permitted to see an out-of-plan
28  specialist, such as Dr. Bryan, and then be reimbursed by their insurers.  Exhibit B
    at ¶ g.

4

monitor.  Government's Exhibit D (Day 2, Vol. II) at pp. 158-59.  Dr. Bryan supplied all of his medical records and, as Ms. Mayorga recalled, he had an auditor visit his office at least twice.  Government's Exhibit D (Day 2, Vol. I) at pp. 72-73, 74.  The Medical Board, which was well-aware of Dr. Bryan's medical practice and billing during much of the alleged offense period was sufficiently satisfied with his performance that Dr. Brian successfully completed his probation.  Government's Exhibit D (Day 2, Vol. II) at p. 159.

As the court is certainly aware, administrative actions require and attorney and are costly to defend against.  Therefore, Dr. Bryan, certainly with the advice of counsel, merely agreed that the Medical Board could make out a *prima facie* case.  He did not admit liability.  As the recitals to the settlement show, Dr. Bryan agreed not to contest the administrative hearing in the interest of a "prompt and speedy settlement of the MBE's accusation."  Government's Exhibit D (Day 2, Vol. II) at p. 158.  Had anything that provoked the Medical Board's accusation have shown up during the probationary period, February 4, 2011 to February 3, 2013, Dr. Bryan would have been subject to further discipline.  Clearly, the Medical Board was satisfied that his practice of medicine comported with professional standards during that period of time.

Thus, if anything, the action by the Medical Board, including its audit of Dr. Bryan's medical and billing records, proves the opposite of the government's insinuations.  He was being strictly scrutinized during the charged offense period and was found to be a conscientious practitioner.

**C.**    ***The Government Did Not Prove that Dr. Bryan Structured More than $478,160***

At trial, the government, which either selected its charges or had a grand jury reject some of them, convinced a jury to find that Dr. Bryan was responsible for $478,160 in structured deposits.  Now, it asks the Court to sentence Dr. Bryan based on $1,271,213 in cash deposits, a sum nearly three times larger, based on

1   allegations that were not proved at trial.  It is the difference between a sentence at
2   level 18, which corresponds to the proof at trial, and level 20, which improperly
3   criminalizes every cash deposit the doctor made.

4           As evidence that these were also structured deposits, the government relies
5   on the testimony of Dr. Bryan's wife, Karla Dosamante.  Government's
6   Sentencing Position, at p. 13.  Yet, there is not one statement made by Ms.
7   Dosamante that is evidence of additional structuring.  Ms. Doamante's statement
8   that deposits were made at multiple banks in amounts under $10,000 does not in
9   any way prove anything other than that there were more cash deposits.  Likewise,
10  while $600,000 may have been deposited to a single Bank of America account
11  over a nearly nine month period, this only shows that, between the charged
12  deposits and the uncharged deposits, half of the cash deposits were made to one
13  bank in daily average increments of about $3,000, excluding weekends.  In fact,
14  $227,160 of the deposits to Bank of America were accounted for in the charged
15  counts.

16          Clearly, the government seeks to dispense with the law and criminalize
17  cash. Having had a trial and having had all of defendant's deposits on display, the
18  court should appropriately use the amount of deposits for which the doctor was
19  convicted, $478,160, and the according offense level of 18.

20  **D.     *The Government Exaggerates the Alleged Magnitude of Dr. Bryan's***
21  ***Prescribing***

22          Quite clearly, the government has been using structuring charges as a proxy
23  for unfounded allegations that it determined not to charge.  As the government's
24  own witness testified, Dr. Bryan specialized in treating very ill patient's who were
25  suffering from pain.  He used carefully determined protocols that consisted of
26  scanning voluminous medical records, obtaining lists of medications that patients
27  were using and compiling medical histories.  All patients were examined, some
28  were rejected and, when necessary, were given substantial time with the doctor.

6

Although some patients had to return to receive their prescriptions, Dr. Bryan met face-to-face with these patients, whose identification was scanned and addresses were updated, on a monthly basis.[5]

The California Medical Board, which had Dr. Bryan's medical and billing records and was auditing his medical and billing practices over the course of the offense period, concurred with Ms. Mayorga's first-hand knowledge that Dr. Bryan was adhering to professional standards.  As a condition of his probation, they saw how his office was run, the types of patients he saw, his prescribing practices and how he billed patients.  Despite the government's unproven allegations, Dr. Bryan successfully completed a three year period of auditing and probation.  His license was fully restored at the end of the three-year period.

Dr. Bryan had a specialized pain practice that incorporated his training in integrative medicine.  He did not see patients who were more appropriate for doctors with a family practice.   As the government admits, "opiate controlled drugs can have medicinal value" and, "in treating the severe pain from cancer, recent surgery, or in palliative care – the law carves out an exception allowing such drugs to be prescribed by doctors who act with a legitimate medical purpose."  Government's Sentencing Position, at p. 20. While the government appears to hold it against Dr. Bryan that he saw the same patients, month after

_____

[5] For appropriate patients seeing a specialist, insurance companies will typically cover opiate prescriptions well above the threshold Morphine Equivalent Dosage (MED), Exhibit C, and Medicare makes exceptions for patients for which higher dosages are a medical Necessity, Exhibit D, at pp. 212 to 213.  Because of patient tolerances, there is no upper limit on opiate dosages.   While the government insists that a MED of 200 mg. is three times as likely to be lethal in an ordinary patient, Government's Sentencing Position at p. 6, this statistic does not account for chronically ill patients experiencing intractable pain.  This is why Medicare and other providers make an exception for such patients.  Exhibit C; Exhibit D at p. 213.

month, *id.* at p. 16, this is exactly what one would expect from a legitimate practitioner.

Likewise, the unmoored statistic that Dr. Bryan wrote 6,559 prescriptions over the course of the charged time period quickly unravels in context. Given 328 patients over a 27-month period this amounts to less then one prescription per patient per month. *Id.* Since Dr. Bryan saw all of his patients monthly, his patient load of 328 patients would have allowed him to see about 16 per day, given a five-day work week. Over the course of a day, this would be about two patients an hour (or 30 minutes each). All of the evidence demonstrates that Dr. Bryan ran a specialized, orderly and legitimate medical practice.

Dr. Bryan did not endanger the public. He saw and continues to see very sick patients who rely on him for his level of care and attention to their conditions.

**E.**      ***The Government Can't Back Up Its Claims About Defendant's Use of Money Orders in 2016***

At the time of the search of Dr. Bryan's home and office in 2016, the government found no cash other than the cash in Dr. Bryan's wallet. Since that time, Dr. Bryan has made a point of running a non-cash practice. He has, however, accepted money orders as payments. Now the government has seized on this and the little known $3,000 reporting requirement for money orders to insinuate that Dr. Bryan is still structuring. As the government admitted in an email to counsel, it would withdraw the allegation regarding the issue of money orders if defendant had sufficient evidence to prove he did not purchase the money orders. The government also conceded that it had no evidence other than that presented in its sentencing brief and opposition to motion for bail pending appeal that the defendant purchased the money orders.

The only evidence before this Court is that the money orders were tendered in blank form to Dr. Bryan's patients by the Postal Service. Accordingly, when they were used, the "From" line was filled out with Dr. Bryan's name and the "Pay

8

1  to" line was filled out by defendant's wife.  Dosamante Declaration.  The

2  government, however, mistakenly conflates the "From" line with the name of the

3  purchaser.  See Exhibit J to Government's Sentencing Position (Declaration of

4  Bryan Glover) at ¶ 3.

5       As Dr. Bryan's wife, Karla, explains, these money orders were used to pay

6  Dr. Bryan's personal and business American Express cards.  Dosamante

7  Declaration.  Far from being evidence of further structuring, the money orders

8  demonstrate that Dr. Bryan had advised his patients that he no longer would

9  receive cash payments and needed them to find an alternative method of payment.

10  He never guessed that receiving and using money orders might create a further

11  problem or new allegations.

12  **F.**   ***The Government Cannot Use a Fine as a De Facto Forfeiture***

13       The government now asks the court to order a *de facto* forfeiture based on

14  two unproven claims: First, that all of the cash payments Dr. Bryan received were

15  for illicit prescriptions, a claim that even the Probation Officer has rejected, see

16  PSR (Doc. 96) at ¶ 21, and second, that all cash deposits can be treated as

17  structured deposits.  As testimony and letters from patients and the community

18  attest, none of this is true.  The government's claims of ill-gotten gains are

19  baseless insinuations.

20       It is only by alleging that Dr, Bryan is someone whom he is not that the

21  government seeks to impose an excessive fine that is nearly 23 times the $60,000

22  maximum fine for a level-18 offense in the Federal Sentencing Guidelines.

23  U.S.S.G. § 5E1.2(c)(3) (2014 ed.).  Structuring, the only offense charged in this

24  case, produces no ill-gotten gain and nothing to disgorge.  Based on the record and

25  the evidence the fine that the government has requested is baseless.

26  **G.**   ***The Status of Dr. Bryan's Licence Is Already Pending before the Medical***

27       ***Board***

28       This Court has implicitly recognized that Dr. Bryan is not a threat to the

community by continuing him on bond and declining the government's prior motion to demand the surrender of his DEA license.  Doc. 85.  Under similar circumstances, an *ex parte* request by the State Attorney General, seeking an interim order suspending Dr. Bryan's medical license was denied by the administrative law judge hearing the Board's complaint against Dr. Bryan. Exhibit E.  The Board was provided with a full transcript of the trial of this matter as part of the *ex parte* request.  Therefore, the Board was informed of all of the government's allegations at the time the *ex parte* was denied.

Inasmuch as the matter of the defendant's license is currently pending before the appropriate body, the Medical Board of California, there is no reason for this Court to alter its ruling on Dr. Bryan's DEA license.

**H.** ***Because of the Needs of Dr. Bryan's Patients, the Appropriate Sentence is Probation or Home Confinement***

As has been set forth in Dr. Bryan's Sentencing Memorandum, herein and in the many letters received on Dr. Bryan's behalf, his practice is legitimate and his patients have a compelling need for his care.  Notwithstanding speculation on the part of the government's pharmacy witness, Michelle Lee Thatcher, Dr. Bryan is credentialed to see the kinds of patients he sees and to prescribe in the manner he does.  He is board certified as an HIV, pain and addiction specialist, and is a Diplomate of the American Board of Integrative Holistic Medicine.  Exhibit A. Far from being a "pill mill," he is a physician with a compassionate practice that is primarily devoted to caring for serious ill patients.

Because of the many kinds of care he provides, Dr. Bryan is particularly suited to the unique kinds of patients he sees.  There are many reasons for the Court to mitigate the sentence in this case.  The defendant is a first offender.  He is an accomplished physician wha has chosen to expand his medical knowledge.  He has continued to contribute to the community.  He committed a regulatory offense. He has survived the government's attempt to use this case as a vehicle for

10

unfounded allegations.  Neither his employee, who was called by the government, nor an ongoing audit by the Medical Board turned up any significant evidence of impropriety.  And, there is a group of seriously ill patients who rely on his care.

There is no reason to incarcerate this man and very good reasons why probation or house arrest will better serve the public and the interests of justice.

**I.**     ***Dr. Bryan Should Be Granted Bail Pending Appeal***

In arguing that Dr. Bryan should be denied bail pending appeal, the government proves the merits of defendant's appeal.  After being given some latitude by the Court, the government has tenaciously converted this structuring case into one that is shrouded in unsupported allegations of narcotics offenses.  Its lead witness, who had had no expertise in the practice of medicine and medical specialization, testified that Dr. Bryan's prescriptions were "red flags" to her as a Medicare auditor.  She apparently chose to ignore that Dr. Bryan is Board certified to treat both HIV and pain patients and that the majority of his patients are long-term and suffer from chronic pain.[6]  The government went on to incorporate these spurious and irrelevant allegations in its closing arguments.  The jury was clearly tainted by extraneous accusations that had nothing to do the case before them.

Now that Dr. Bryan is seeking bail pending appeal, the government is back with the same insinuations.  While it claims that Dr. Bryan has offered no credible evidence of the nature of his practice, he was not on trial for his professionalism or care of patients.  Moreover, he has more than established the legitimacy of his medical practice and qualification in this Reply and in his Sentencing Memorandum.

While the government harps on the claim that Dr. Bryan continues to prescribe the same medications to the same patients, month-after-month, this is

---

[6] Dr. Bryan is a Board Certified recognized specialist in the field of HIV Medicine.  Exhibits A & F

11

exactly the basis upon which Dr. Bryan claimed the need to retain his DEA license and why he now requests bail pending appeal.  He has a practice that mainly consists of very ill patients who rely on him for their prescriptions and continuity of care.  While Dr. Thatcher may be an expert in pharmacy, she is not an expert in the practice of medicine and, specifically, she has no training in Dr. Bryan's area of medicine.  The government's claim that Dr. Bryan is "wrong" to state that Thatcher lacked the training to treat HIV patients, Government's Opposition to Bail Pending Appeal (Doc. 102) at p. 10, is itself simply ***wrong***.  He is certified as an HIV specialist (Exhibit A), which qualifies him as being credentialed to treat HIV patients (Exhibit F).

Thus, not only did Thatcher testify beyond her area of expertise, she very plainly gave testimony that was simply false.  Likewise, her assumptions about dosages are also misinformed.  As a pain specialist with justification for particular patients where it is medically necessary, such as cancer patients, Medicare and other insurers regularly cover a higher morphine equivalent dosage (MED).  Exhibits C & D.  Pharmacists also set protocols for when a MED is at least 90 mg. or at least a 200 mg. threshold.  Exceptions are implemented when a medical necessity has been identified.  Exhibit C at p. 213.

While Thatcher could state whether a particular prescriber might come to the attention of Medicare, she had no knowledge of Dr. Bryan's practice areas and patients.  Accordingly, she was clearly unqualified to offer many of the opinions that she gave, particularly in a structuring case.  This was plainly prejudicial and, as the government's bail opposition and sentencing position prove, the evidence continues to be bootstrapped to distort Dr. Bryan's career and service to his patients and the community.

The Court is well aware that he is neither a flight risk nor danger to the community.  He is very much an asset.  Bail should be granted on appeal.

12

1

**CONCLUSION**

2          For the foregoing reasons, Dr. Washington Bryan should be allowed to

3   continue his role in society as a respected physician, either through a grant of

4   probation or a sentence of home confinement.  He should also be admitted to bail

5   pending appeal.

6   Dated: February 18, 2017                    Respectfully submitted,
                                                 SHERMAN & SHERMAN
7

8                                                /s/
9                                                VICTOR SHERMAN
                                                 Attorneys for Defendant,
10                                               WASHINGTON BRYAN II

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28